## WILLIAM DAVID HARRIS *v.* STATE OF MARYLAND

[No. 1149, September Term, 1977.]

*Decided July 13, 1978.*

The cause was argued before MORTON, DAVIDSON and MACDANIEL, JJ.

*Michael R. Malloy, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Ray E. Stokes, Assistant Attorney General,* with· whom were *Francis Bill Burch, Attorney General, Maria A. Kendro, Assistant Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Paul Kemp, Assistant*

*State's Attorney for Montgomery County,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

In a jury trial held in the Circuit Court for Montgomery County (Mathias, J., presiding), appellant, William David Harris, was convicted of first degree murder, two counts of robbery with a deadly weapon, two counts of assault and battery and one count of use of a handgun in the commission of a felony. Appellant was sentenced to life imprisonment for the murder conviction, concurrent fifteen and ten year sentences for the robbery convictions, a concurrent one year sentence for each assault and battery conviction and a concurrent ten year sentence for the handgun violation.

In this appeal appellant contends that the trial judge erred when he refused (1) to admit into evidence an out-of-court statement of a codefendant which would tend to exculpate appellant; (2) to suppress certain evidence seized from appellant's place of employment; (3) to allow appellant to present evidence in surrebuttal; (4) to grant appellant's motion for a judgment of acquittal; and (5) to merge appellant's lesser convictions into his murder conviction.

The record shows that about 7:30 p.m. on March 26, 1977, appellant and three other individuals entered the apartment of Michael Emory, located in Bethesda, Maryland, where they robbed Emory, his girlfriend, Beverly Ferchak, and a friend, Andrew Markow. Over $100 in cash, a shotgun, several bricks and a few baggies of marijuana were taken as were some personal items of the victims. Ms. Ferchak testified that Gregory Jones and Craig Cobb, two of appellant's accomplices, then dragged Emory into an adjoining room and shot him to death.

As a result of information supplied by Markow and Ms. Ferchak, several officers of the District of Columbia and Montgomery County, Maryland, police departments proceeded to appellant's house at 5:30 a.m. on March 27, where a warrantless search was conducted. Failing to find appellant or uncover any evidence there, the police officers

then proceeded to the Colorado Building, an office building located in the District of Columbia, where appellant worked as a night watchman. One of the officers, Detective Raymond Green, knocked on the entrance door and when appellant appeared, pointed to his watch "like ... [he] was going to work ..." in order to induce appellant to open the door. When appellant did so, he was arrested.

Appellant was immediately handcuffed, taken to a desk in the lobby and seated. Detective Green then proceeded to a staircase which was located, according to appellant, about three or four feet from the desk and picked up a pillow situated on the fifth or sixth step thereof.[1] Among other things, a .32 caliber gun was discovered when the pillow was removed. After appellant was advised of his *Miranda* rights, he led the police to the basement of the building where he had secreted some packets of marijuana.

Appellant concedes that the gun seized by the police at the Colorado Building belonged to him and was the murder weapon. He asserts, however, that Cobb and Jones were the murderers and that he actively protested the shooting of Emory.[2] He further asserts that after the assailants left Emory's apartment, his gun was returned to him together with approximately one fourth of the marijuana taken during the robbery. Appellant contends that Cobb and Jones used his gun to commit the murder and then returned it to him, along with some of the "stolen" marijuana, in order to "set him up" as the perpetrator of the crime.

Otherwise stated, appellant's defense was that he was coerced by Jones and Cobb into participating in the robbery. He testified that about 5 p.m. on March 26, he was approached by Jones and Cobb, both of whom he had known for approximately one month, outside the RKO Theatre in Washington, D.C., and, at gunpoint, was forced into their car and compelled to go with them to Emory's residence. Their interest in Emory, who was a friend of appellant, lay in the

---

[1]. Detective Green testified that the pillow was "no more than ten or twelve feet" from where appellant was seated.

[2]. Markow also testified that appellant protested the physical abuse of Emory.

fact that he was a known dealer of marijuana and would therefore be a prime robbery victim. Appellant testified that he complied with their demands because they had a gun in his ribs and he was "in fear of being shot down." At their insistence, appellant gave them his pistol. Appellant admitted that because of the coercion he assisted in the robbery, but did not participate in the murder and protested the violence.

According to appellant, he and the assailants left Emory's apartment together by automobile and in the course of the drive Cobb and Jones threatened appellant's life as well as members of his family. Appellant testified that he managed to save himself by convincing them that he would not tell the police about the incident. Appellant stated that he went to work shortly after he was released and was soon thereafter arrested. Upon his arrest appellant made a statement to the police essentially identical to his testimony at trial.

In support of his position that he had been coerced into participating in the crime, appellant attempted to offer the testimony of . David Morgan, who was incarcerated with appellant's co-defendant Jones in the Montgomery County Detention Center. Appellant's trial counsel proffered that Morgan would testify as follows:

> "During a period that they were out in the exercise or recreational yard, that he overheard Gregory Jones bragging that he had blown away Michael Emory or a Mike.
>
> I don't know what he actually said about the decedent in this case; but he had kidnapped, and that was the word that Mr. Morgan used, kidnapped Mr. Harris and took him to the location on Cheltenham Drive to help them find out where the individual who had the marijuana was located."

The State objected to the admission of this statement, contending that it constituted hearsay and did not qualify under the admission against penal interest exception.

It is clear that Morgan's proffered testimony as to Jones' statement constitutes hearsay since it is an out-of-court statement offered in court to prove the truth of the matters

asserted therein. *Mutyambizi v. State,* 33 Md. App. 55, 65 (1976). Appellant argues, however, that "Morgan should have been allowed to report Jones' statement because it was made against Jones' penal interest and because there was no reason to believe that it was collusive or frivolous."

We glean from our review of the history of the declaration against interest exception to the hearsay rule that this exception traditionally was limited to declarations against pecuniary or proprietary interest. *See Thomas v. State,* 186 Md. 446 (1946), for a thorough review of the common law origins and development of the rule. The distinction between statements relating to penal matters and those relating to material ones lies in the belief that the admission of an acknowledgment of facts rendering one liable to criminal punishment would, unlike an acknowledgment of a debt, open the "door to a flood of perjured witnesses falsely testifying to confessions that were never made." McCormick on Evidence § 278 (2d ed. 1972). A trend has arisen in recent years, however, to limit, if not abrogate, this distinction. 5 Wigmore, Evidence § 1477 (Chadbourn rev. 1974). To this effect, McCormick, *supra,* at 674, commented:

> "Wigmore,[3] however, is probably right in believing that the argument of the danger of perjury is a dubious one since the danger is one that attends all human testimony, and in concluding that 'any rule which hampers an honest man in exonerating himself is a bad rule, even if it also hampers a villain in falsely passing for an innocent.' Under this banner, saluted also by Holmes, J., in a famous dissent, a few progressive courts have relaxed the rule of exclusion of declarations against penal interest in particular situations or generally." (Footnotes omitted.)

Maryland is one of the so-called "progressive" states that allows the admission of a declaration against penal interest, although some limitations have been placed thereon. In *Dyson*

---

3. Wigmore, *supra,* in fact has categorized as "barbarous" the rule prohibiting the admission of declarations against penal interests while allowing declarations against pecuniary and proprietary interests.

*v. State,* 238 Md. 398, 407 (1965), the Court of Appeals articulated the rule adhered to in this State:

"Although Maryland formerly followed the general rule that a penal declaration against interest of a third party was not admissible evidence, the later cases have established that a confession by one other than the defendant, that he committed the crime in question, should be received and considered by the trier of the guilt of the accused, unless it is clearly collusive, frivolous or otherwise obviously untrustworthy. *Brady v. State,* 226 Md. 422; *Thomas v. State,* 186 Md. 446; *Wiggins v. State,* 235 Md. 97, 103; *Brennan v. State,* 151 Md. 265; 23 Md.L.Rev. 178."

We further observe that the determination of the trustworthiness of the out-of-court declaration is "entrusted in the first instance to the sound discretion of the trial judge." *Brady v. State,* 226 Md. 422, 429 (1961).

The State argues that Jones' declaration is lacking in trustworthiness because "[t]here was absolutely no showing that Jones' declaration was anything other than a boastful remark of one incarcerated individual to another." Appellant, on the other hand, argues that there was no evidence of collusion, frivolousness or untrustworthiness. He contends that his statements to the police immediately after his arrest are consistent with Morgan's proffered testimony, thus lending it an indicium of reliability. Moreover, appellant argues that Jones refused to testify in appellant's behalf by invoking his rights under the fifth amendment [4] and that the prosecutor informed the trial judge that he intended to call appellant as a State's witness against Jones in his upcoming trial, all of which would tend to negate collusion between Jones and appellant.

---

4. To invoke the declaration against penal interest exception, it must be shown that the out-of-court declarant was unavailable at the time of trial. Wilkins v. State, 11 Md. App. 113, 131 (1971). In this regard, a declarant's "successful claim of privilege made him 'unavailable' within the intent of the exception to the hearsay rule." *Id. See also* McCormick, *supra,* § 280. The State does not contest that Jones became unavailable by exercising his right under the fifth amendment not to testify.

In *Dyson,* the defendant was charged with rape. His primary defense was that one James Melvin had confessed to the police that he, not Dyson, had committed the rape in question. In attacking the trustworthiness of Melvin's confession, it was adduced at trial "that there were a number of demonstrable errors, inconsistencies and improbabilities in Melvin's confession." In addition, "[i]t was also brought out that Melvin had been at Crownsville Hospital for mental patients and was an avid reader of newspaper accounts of crime." *Dyson v. State, supra,* at 406. Nonetheless, the Court of Appeals concluded that "there was no evidence of collusion as to the Melvin confession and it was not on its face obviously untrustworthy . . . ," *id.* at 408, and thus it was admitted.

When viewed by this standard, we can only conclude that the trial judge abused his discretion when he ruled that Jones' prison-yard declaration was untrustworthy. The only argument put forth by the State indicating untrustworthiness in Jones' declaration was that Jones was merely "bragging" about his criminal exploits. It is pellucid that this scant and speculative indication of untrustworthiness pales in comparison to that of Melvin's in *Dyson* whose declaration was ruled to be admissible.

Although applied in a different context, the following words of Mr. Chief Justice Burger, speaking for the Supreme Court in *United States v. Nixon,* 418 U. S. 683, 709 (1974), are especially appropriate to the case *sub judice:*

> "We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence."

Furthermore, the Supreme Court noted in *Chambers v. Mississippi,* 410 U. S. 284, 302 (1973), that "[f]ew rights are

more fundamental than that of an accused to present witnesses in his own defense." *See also In Re Oliver,* 333 U.S. 257 (1948).

Since we feel that a declaration against one's penal interest, standing alone, has an inherent indicium of trustworthiness, *cf., Merrick v. State,* 283 Md. 1 (1978), it is our judgment that only in those cases where there is evidence that the out-of-court declaration is untrustworthy, frivolous or collusive should the jury be precluded from receiving and assessing the statement.[5] To hold otherwise would serve to usurp the traditional role of the jury as the trier-of-fact and, concomitantly, deprive an accused of his right to due process under the law. *See Chambers v. Mississippi, supra.* In our view, appellant was thus deprived of this right at his trial below and, accordingly, we are compelled to reverse his convictions.

By virtue of our reversal of appellant's convictions, we do not reach his remaining contentions.

> *Judgments reversed; case remanded for a new trial; costs to be paid by the County Council of Montgomery County.*

---

5. *Compare* Ragler v. State, 18 Md. App. 671, 675-76 (1973).