STATE OF CONNECTICUT *v.* RICHARD DEFREITAS

COTTER, C. J., LOISELLE, BOGDANSKI, SPEZIALE and HEALEY, Js.

Argued October 4, 1979—decision released January 8, 1980

*Michael R. Sheldon,* with whom were *Richard L. Lougee* and, on the brief, *James J. Barrett III,* law student intern, for the appellant (defendant).

*C. Robert Satti,* state's attorney, with whom was *Richard C. Shiffrin,* assistant state's attorney, for the appellee (state).

COTTER, C. J. The bodies of a man and a woman buried in a shallow grave in a wooded area behind an A-frame house on Shewville Road in Ledyard, Connecticut were recovered by the Connecticut state police on May 30, 1974, acting on information supplied by Joanne Rainello, formerly the defendant's common-law wife. At an autopsy it was determined that the man had died from gunshot wounds of the head and chest and that the woman had died from a gunshot wound of her head and brain.

A grand jury, on November 12, 1974, found a true bill of indictment charging the defendant with two counts of murder in the first degree in violation of General Statutes § 53-9 (now § 53a-54a). Thereafter, a petit jury of twelve returned a verdict of guilty on both counts of the indictment as to the defendant Richard DeFreitas and his codefendant Donald Brant, now deceased. The defendant's motion to set aside the verdict was denied, judgment was entered, and the defendant has appealed.

## I

The defendant has essentially raised two claims of error on appeal. To understand fully the nature of these claims and their factual as well as legal underpinnings, it is necessary first to delineate the facts that the jury might reasonably have found from the evidence introduced at trial which serve to implicate the defendant with the murdered persons unearthed by the state police.

The dead male body discovered in the shallow grave on May 30, 1974, was identified subsequently by dental records as Gustavous Lee Carmichael; the identity of the female body was never established. On October 5, 1970, Carmichael and another man escaped from a deputy United States marshal while being transported from a Massachusetts state prison to federal court in Hartford to be sentenced for charges then pending against them. Carmichael and the other man robbed a New Jersey bank on December 22, 1970 of approximately $60,000. Carmichael and a woman companion (the other murder victim) six days later on December 28, 1970, appeared at the A-frame Ledyard home of the defendant DeFreitas and his common-law wife Joanne, who were living there under the names of Ray and Joanne Emerson.

On that date the defendant, DeFreitas, returned to his Ledyard home after having committed a bank robbery in Newport, Rhode Island where he had stolen approximately $30,000. By his own admission DeFreitas was a professional thief and robber.

Among the defendant's criminal associates were the other defendant, Donald Brant, now deceased, and James Gardner, who, along with Joanne

Rainello, offered the crucial testimony linking the defendants DeFreitas and Brant to the murder of Carmichael and his companion. Both Brant and Gardner were at DeFreitas' home on the evening of December 28, 1970 and in the presence of Carmichael and his woman companion, DeFreitas divided the $30,000 spoils from his robbery with Brant and Gardner. DeFreitas stated that the three were partners and should take care of each other. When one of the three would commit a robbery, they would share the proceeds; the trio possessed a number of weapons in their arsenal; and maintained some apartments around Providence where they would harbor criminals.

Carmichael and his companion came to Ledyard on the run from the police and were seeking a place to hide out. They stayed two nights at the DeFreitas home and DeFreitas provided them with false identity papers in the names of Dirk and Lorraine Stahl who had once been residents of the same inn as the defendant. He had appropriated some of their identification documents. Carmichael's woman companion opened a checking account under the name of Lorraine Stahl and on December 30, 1970, the couple moved to a home they had rented in Noank under the name of Stahl.

During the time that Carmichael's female companion, who was now using the name Lorraine Stahl, was at DeFreitas' Ledyard home, she expressed fears to Joanne Rainello about the life she was leading, and told her that she was nervous about using fictitious names and was afraid of being caught by the police and what she might say if she were apprehended. Rainello relayed this information to DeFreitas soon after it was told to her.

At this point the defendant summoned Donald Brant from his home in Rhode Island to discuss the threat that Carmichael's companion posed. DeFreitas and Brant decided to kill both Gustavous Carmichael and his unidentified female companion because DeFreitas and Brant concluded they had too much at stake and that, in light of Carmichael's feelings for his girlfriend, they could not kill her without killing him as well. After making plans to carry out the murders with Brant, DeFreitas lured the victims back to his A-frame house on Shewville Road in Ledyard on December 31, 1970. The defendant shot Carmichael repeatedly and killed him; then Brant shot and killed the woman. Both the defendant and Brant described to Joanne Rainello and James Gardner how the shootings had taken place. Rainello had been out of the house at the time of the murders and was picked up by DeFreitas shortly after the shootings; Gardner had been called by DeFreitas to come to the Ledyard house because of a "problem." When he arrived at the A-frame house, Gardner was told for the first time that DeFreitas and Brant had murdered Carmichael and his female companion. The reason given to Gardner for the murders was that DeFreitas and Brant feared that Carmichael's female companion, to save herself, would, if Carmichael were caught by the police, reveal everything she knew about those who had helped Carmichael. Gardner then assisted DeFreitas and Brant with the burial of the bodies.

## II

The first claim raised by the defendant in his appeal is that the trial court erred in excluding the testimony of three witnesses who were called by

the defense to testify about alleged third party declarations against penal interest. The defendant contends that these declarations were inconsistent with the guilt of the defendant and thus their exclusion deprived him of his due process right to a fair trial in violation of the fourteenth amendment to the United States constitution.

The three witnesses called by the defense purportedly were to testify as to five declarations concerning the murders in question in the present case which were allegedly made by the following third party declarants: James Gardner and Joanne Rainello, both of whom had earlier in the trial been called to testify by the prosecution and who were testifying under a grant of immunity by the state, and one John Robichaud, who had died prior to the trial.

The first of these witnesses, Thomas A. Greene, called by the defense testified that he was then serving a sentence for robbery and in the previous fifteen to twenty years he had had many felony convictions. He also testified that he had known James Gardner for about fourteen years and Gardner was the best man at his wedding on December 7, 1970. When Greene started to testify about a conversation he had with Gardner two and one half weeks after the wedding, the state's attorney objected.

In the absence of the jury the defendant's trial counsel made an offer of proof as to the content of two conversations between Gardner and Greene. In the course of the first conversation Gardner allegedly requested Greene to kill a man and a woman in Connecticut. In the second conversation which was supposed to have taken place in early January, 1971, Greene asked Gardner whether he

had been "kidding" about the request in the first conversation and Gardner allegedly replied that the matter had been taken care of by Gardner and another person who was named by Gardner and who was not either of the defendants on trial. At one point, in addition, the defendant's attorney advised the court that the testimony be admitted since it bore a marked identity to the offense being tried and therefore there was a suggestion that the offense might very well have been committed by Gardner.

The next witness called by the defense was Gerald Mastracchio who testified that he was at that time serving a life sentence for robbery and murder and that he had a substantial felony record for over thirty years. He knew James Gardner and one John Robichaud, having been incarcerated with them both in the Adult Correctional Institute in Cranston, Rhode Island. Robichaud at the time of the trial was deceased. As Mastracchio was about to testify to an alleged conversation he had with Robichaud concerning Carmichael, one of the victims in this case, and a young woman, presumably the other victim, the state's attorney objected and again the jury were excused. The defense's offer of proof was that Mastracchio would testify that Robichaud had told Mastracchio that Gardner and Robichaud had murdered Carmichael and the young woman and then buried their bodies. Just before being excused as a witness Mastracchio indicated to the trial court that he would like to testify further and he was permitted to relate in the jury's absence the contents of those further statements. Mastracchio testified that he had once spoken with Joanne Rainello in the visiting room of the Adult Correction Institute in Rhode Island sometime in

the 1970s when Richard DeFreitas was present. At that meeting she allegedly asked Mastracchio if he could get in touch with John Robichaud because she feared Robichaud because she had participated in a crime with him and Gardner. Rainello allegedly indicated that she had lured both Carmichael and his female companion over to the house so that Robichaud and Gardner could kill them. Although Mastracchio's proffered testimony was excluded, the defendant DeFreitas on redirect examination testified as to this alleged conversation. The state's objection to his testimony was withdrawn when the claim was made that it was offered to attack Rainello's credibility and to show bias.

The next witness called by the defense was Richard Devlin who testified in the absence of the jury that he was at that time in a Massachusetts prison serving time on a manslaughter charge. He knew Carmichael and Robichaud both of whom had spent time in prison with him. Devlin testified that while he was traveling with Robichaud and another man in early 1971, Robichaud told him that he and a man from Rhode Island named Jimmy had killed Carmichael. Devlin did not recall any mention of a woman being involved in that episode and he stated that Robichaud was no longer alive and that he had been killed.

The defendant contends that the evidence contained in the offers of proof by defense counsel, discussed above, because they constituted third party declarations against penal interest, were excluded as hearsay by the trial court on the basis of *State v. Stallings*, 154 Conn. 272, 224 A.2d 718. He claims that the rule of *State v. Stallings*, supra, is that third party declarations against penal interest exculpatory to the accused are inadmissible as

untrustworthy hearsay statements, per se. Thus the exclusion of the testimony offered by the defense witnessses was claimed to be the product of a mechanistic application of the hearsay rule which should be deemed unconstitutional in light of the United States Supreme Court's decision in *Chambers* v. *Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297, the case upon which the defendant's claims of admissibility were based.

The defendant's argument underlying his claim that each of the five third party declarations that he desired to offer into evidence should have been admitted seemingly requires that this court address, inter alia, two questions which are important to the administration and supervision of criminal justice in this state: First, whether *State* v. *Stallings,* supra, establishes a per se rule excluding the admission of third party declarations against penal interest which are inconsistent with the guilt of the accused, and second, what considerations must a trial court take into account in light of *Chambers* v. *Mississippi,* supra, when deciding whether to allow into evidence such declarations. This court need not, however, address these questions in deciding whether the trial court committed error in failing to admit the declarations allegedly made by James Gardner and Joanne Rainello to Thomas Greene and Gerald Mastracchio because a consideration of certain threshold issues clearly indicates that the trial court did not err in refusing to admit these third party declarations into evidence.

A

The hearsay rule serves to exclude from evidence those statements made out of court, such as third party declarations against interest, which are

offered to establish the truth of the facts contained in the statement. *Babcock* v. *Johnson,* 127 Conn. 643, 644, 19 A.2d 416; *Murray* v. *Supreme Lodge, N.E.O.P.,* 74 Conn. 715, 718, 52 A. 722; Tait & LaPlante, Handbook of Connecticut Evidence (1976), p. 177. The principal grounds for this rule of exclusion are the absence of an oath and the lack of the test of cross-examination. *Shea* v. *Hyde,* 107 Conn. 287, 289, 140 A. 486. See also *State* v. *Barlow,* 177 Conn. 391, 396, 418 A.2d 46; *General Motors Acceptance Corporation* v. *Capitol Garage, Inc.,* 154 Conn. 593, 597, 227 A.2d 548. A third concern has also been expressed: the lack of the personal presence of the out of court declarant, which results in the jury's inability to observe the declarant's demeanor so as to judge credibility. *Douglas* v. *Alabama,* 380 U.S. 415, 418–19, 85 S. Ct. 1074, 13 L. Ed. 2d 934.

Exceptions to the hearsay rule have arisen when necessity exists, that is, the knowledge that the only alternative would be to abandon all attempts to prove certain kinds of facts; *Warner* v. *Warner,* 124 Conn. 625, 638, 1 A.2d 911; Holden & Daly, Connecticut Evidence § 93b, pp. 415–16; and when circumstances exist which can be deemed to render the statement in question " 'equivalent in reliability and trustworthiness to the standard of ordinary testimony when subjected to cross-examination.' " *Shea* v. *Hyde,* supra, 289. The twin standards of necessity and reliability were evident when this court delineated the requirements for the admissibility of third party declarations against pecuniary or proprietary interest in *Ferguson* v. *Smazer,* 151 Conn. 226, 232–34, 196 A.2d 432. The necessity factor is reflected in the prerequisite that the declar-

ant be unavailable. Id., 232. Several exceptions to the hearsay rule require the declarant to be unavailable as a witness at the present trial.[1]

It should be noted that while as a general practice cases speak of the unavailability of the witness, the critical factor is the unavailability of the witness' testimony; see, e.g., *Mason* v. *United States,* 408 F.2d 903, 905 (10th Cir.); since the witness may be physically present in court but his testimony nevertheless unavailable because of such barriers as testimonial privileges or mental incapacity. McCormick, Evidence (2d Ed.) § 253, pp. 608–610. The most common forms of unavailability that have been recognized are: death, inability to find the witness, absence from the jurisdiction and beyond the reach of subpoena, mental incapacity, failure of memory, and exercise of a testimonial privilege. See McCormick, op. cit., pp. 608–12, and the cases cited therein. In two of the three cases in which this court has had occasion to consider the admissibility of third party declarations against penal interest, the declarant was clearly unavailable. *State* v. *Stallings,* supra, 287 (declarant's whereabouts conceded to be unknown), and *State* v. *Mosca,* 90 Conn. 381, 387, 97 A. 340 (declarant known to be in Italy at time of trial). In *State* v. *Beaudet,* 53 Conn. 536, 539, 549, 4 A. 237, the court did not mention unavailability nor did it need to since the court held that the third party declaration against penal interest did not at all exculpate the accused.

---

[1] The most often mentioned are: declarations against interest; dying declarations; statements of pedigree and family history; and former testimony. See McCormick, Evidence (2d Ed.) § 253, p. 608 n.20.

The Supreme Court's decision in *Chambers* v. *Mississippi,* supra, relied on by the defendant at trial to place into evidence each of the third party declarations, does nothing to alter the common law condition precedent of the declarant's unavailability to the admissibility of third party declarations against penal interest. In *Chambers,* McDonald, a witness, was necessarily called by the defense when the state failed to call him to testify. Orally and in writing McDonald had previously confessed to the murder with which the defendant Chambers was charged. *Chambers* v. *Mississippi,* supra, 289. The witness testified that his confession was false and had been made after he was assured that he would not be incarcerated. Id., 288. Although the written confession was introduced in evidence, the trial court precluded the defendant from cross-examining McDonald because under Mississippi's common law "voucher" rule a party vouches for his witness and thus may not impeach him if he is not deemed adverse. The trial court did not deem McDonald adverse because he did not "point the finger at Chambers." Id., 291–92, 295–97. The effect of the trial court's ruling that the voucher rule applied was to make McDonald unavailable for cross-examination. "[Chambers] was, therefore, effectively prevented from exploring the circumstances of McDonald's three prior oral confessions and from challenging the renunciation of the written confession." Id., 297.

"Defeated [by the trial court's application of the voucher rule] in his attempt to challenge directly McDonald's renunciation of his prior confession, Chambers sought to introduce the testimony of the three witnesses to whom McDonald had admitted that he shot the officer [for whose murder Chambers

was on trial]." Id., 292. The trial court sustained the state's objection to the admission of the testimony of these three witnesses on the ground that it was hearsay. The Supreme Court concluded, after establishing that the excluded testimony of the three witnesses bore "persuasive assurances of trustworthiness," that the exclusion of the three witnesses' testimony as to McDonald's declarations against penal interest, coupled with the trial court's refusal to permit Chambers to cross-examine McDonald, denied Chambers a trial that accorded with traditional and fundamental standards of due process. Id., 302–303.

After reaching this conclusion the Supreme Court went on to state: "In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." Ibid. In the scores of cases decided since *Chambers* which have considered the question of admissibility of third party declarations against penal interest, we have been unable to find a case, nor has the defendant provided us with a citation, where an appellate court has dispensed with the unavailability of the declarant as a condition precedent to admitting such declarations.[2] Moreover, the Federal Rules of

---

[2] On the other hand, these appellate courts almost invariably either mention the unavailability of the declarant as a requirement for admissibility or state sufficient facts to indicate that the declarant is unavailable. See, e.g., *Henson* v. *United States,* 399 A.2d 16, 20 (D.C. App.) (invocation of fifth amendment privilege); *Harris* v. *State,* 387 A.2d 1152 (Md. Ct. Spec. App.) (declarant's exercise of

Evidence permit the admission of declarations against penal interest into evidence only where the declarant is unavailable as a witness. Fed. R. Evid. 804 (b).

It thus remains to be considered whether the testimony of either James Gardner or Joanne Rainello could possibly be considered to have been unavailable at trial. James Gardner had been released from federal prison in another jurisdiction in order to testify in the present case, and had been granted immunity in the present action as well. At no point in the lengthy cross-examination of Gardner did the defense inquire into the subject of his alleged conversations with Thomas Greene.

When Gardner was on the witness stand the defense had the opportunity to cross-examine him as to the role the defense later tried to indicate, by calling Greene as a witness, that Gardner played in the homicides. Gardner was present for detailed questioning concerning his alleged conversations with Greene who would have been available to rebut responses that might have been unfavorable to the defendant. The defense did not, however, follow this course of examination.[3] Rather, it sought to

---

fifth amendment rights creates unavailability); *Commonwealth* v. *Keizer,* 377 Mass. 264, 271, 385 N.E.2d 1001, (declarant fugitive); *People* v. *Edwards,* 396 Mich. 551, 555, 242 N.W.2d 739 (declarant dead); *People* v. *Settles,* 46 N.Y.2d 154, 167, 385 N.E.2d 612 (invocation of right against self-incrimination fulfills unavailability criterion); *Ellison* v. *Commonwealth,* 247 S.E.2d 685, 688 (Va.) (unavailability along with reliability two criteria for admission of declarations against penal interest); *State* v. *Young,* 89 Wash. 2d 613, 626–27, 574 P.2d 1171 (unavailability one of criteria for admission of third party declarations against interest; defendant's failure to subpoena declarant not a showing of unavailability).

[3] To be sure, there exists the possibility that the state might have objected to this line of cross-examination, e.g., as collateral matter, and that the trial court might have sustained the objection. Such conjecture, however, can hardly form the basis for unavailability.

have Greene testify on direct examination as to what Gardner allegedly told him and to have that testimony admitted as an exception to the hearsay rule for the truth of the matter asserted by Greene. The state presumably then could have produced Gardner as a rebuttal witness.

When the unavailability of the declarant is, however, a condition precedent to admitting his hearsay statement, a rule of preference is being expressed. McCormick, op. cit. § 253, p. 608. Personal presence in court, under oath and subject to cross-examination, is to be preferred to the hearsay statement. Nonetheless, the decision whether to cross-examine is almost always a tactical one; *State* v. *Reed,* 174 Conn. 287, 300, 386 A.2d 243; *State* v. *Villafane,* 171 Conn. 644, 676, 372 A.2d 82; and the defense may well have decided that it would be successful only if Gardner had to rebut Greene's testimony as opposed to Greene rebutting Gardner's denial. The defense cannot now contend that Gardner was unavailable when that unavailability resulted solely from its own tactical choice.[4]

See *State* v. *Young,* 89 Wash. 2d 613, 626–27, 574 P.2d 1171. The forms of unavailability that have been recognized are rooted in reality, not speculation. See McCormick, op. cit., pp. 608–12; see also Practice Book, 1978, § 803. Moreover, since Gardner as well as Rainello had been granted immunity by the state it could not even be conjectured that Gardner would exercise his fifth amendment right against self-incrimination, a form of unavailability with which declarants in these circumstances often clothe themselves. See cases cited in footnote 2, supra.

[4] The defendant contends, however, that Gardner's unavailability resulted from the trial court's failure to recall him after it sustained the state's attorney's objection to the admissibility of Greene's testimony. Even if this court leaves in abeyance the fact that the recall was necessitated by the defense's tactical choice, it must be noted that the defense counsel did not request that Gardner be recalled.

At the end of Gardner's testimony, the trial court pointedly asked whether the state or the defense would have any further need for

The same reasoning is applicable to demonstrate the cause of Joanne Rainello's unavailability. The defense did not cross-examine Rainello as to the conversation it is claimed she had with Gerald Mastracchio. Nor did the defense attempt to recall

Gardner since obtaining his release from federal prison posed considerable procedural difficulties. Defense counsel stated that they did not have any further need of Gardner. Later in the trial when the objection to Greene's testimony was sustained by the trial court, the defendant Donald Brant pro se requested that Gardner be recalled so that he could be cross-examined as to his role in the murders and asked about the statements made to Greene. The trial court did not accede to this request.

Before Brant made his request, Brant's counsel stated that Brant did not concur in the procedure that both he, as Brant's counsel, and the other defense counsel had seen fit to take. Brant at the time of his request spoke of the numerous disagreements between the defendants and their counsel. Nonetheless, in this case trial counsel must be considered to represent the defendant. At the beginning of the trial, the court denied the defendant Brant's motion to be designated cocounsel. Although an objection was made to this ruling, the issue has not been raised on appeal and thus need not be examined by this court. *State* v. *Gosselin*, 169 Conn. 377, 378, 363 A.2d 100; *Raffile* v. *Stamford Housewrecking, Inc.*, 168 Conn. 299, 303, 362 A.2d 879. At the time the trial court denied Brant's motion to appear as cocounsel, he also informed Brant, in the presence of DeFreitas, of his constitutional right to represent himself. Neither Brant nor DeFreitas at any point in the proceedings chose to represent himself although Brant, at the commencement of the trial, informed the court through his counsel that at some point in the trial he might want to exercise his option to represent himself should he deem the circumstances to warrant it. Thus, in the present case, trial counsel for the defendants were not cocounsel with the defendants; nor was this a situation where the defendant represented himself with counsel standing by to assist and advise. See *Faretta* v. *California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562.

If his trial counsel could employ one trial tactic, and if that failed, then the defendant pro se could adopt another trial tactic, the trial court could be caught between two opposing positions. This would be a species of trial by ambuscade, a tactic which this court has been quick to disapprove. *State* v. *Rado*, 172 Conn. 74, 81, 372 A.2d 159. Cf. *State* v. *Albin*, 178 Conn. 549, 424 A.2d 259. Hence, it is clear that Gardner's unavailability for cross-examination is due solely to the defense's decisions.

Rainello after Mastracchio's testimony as to his conversation with her had been ruled inadmissible by the trial court.[5] Again, the defense's tactical decisions resulted in the declarant's unavailability. In light of these circumstances, James Gardner and Joanne Rainello cannot be considered to have been unavailable and the trial court's refusal to admit into evidence the testimony of Thomas Greene and Gerald Mastracchio as to their conversations with Gardner and Rainello, respectively, cannot be deemed error.

## B

The defense also sought to offer into evidence the testimony of Mastracchio and Richard Devlin as to alleged oral admissions of guilt by John Robichaud for the death of Gus Carmichael and his female companion. Since Robichaud was deceased at the time of the trial at issue on this appeal, a threshold requirement of unavailability of the declarant for the admission of these third party declarations against penal interest has been met.[6]

To reiterate, the defendant claims on appeal that: (1) the trial court sustained the state's attorney's objection to the testimony of both Mastracchio and Devlin relying strictly on *State* v. *Stallings*, 154

---

[5] Consequently, the argument the defense made as to Gardner's unavailability; see note 4, supra; is not even available with respect to the admissibility of Rainello's declaration.

[6] In the present case in addressing another threshold issue, we need only note that Robichaud's alleged admissions of guilt to Mastracchio and Devlin were clearly declarations against penal interest at the time they were made. See *Chambers* v. *Mississippi*, 410 U.S. 284, 300–301, 93 S. Ct. 1038, 35 L. Ed. 2d 297. See also McCormick, Evidence (2d Ed.), 1978 pocket part, § 278, p. 83 ("As to what is against penal interest, quite obviously the essential characteristic is the exposure to risk of punishment for a crime").

Conn. 272, 224 A.2d 718; (2) *State v. Stallings* holds that third party declarations against penal interest exculpatory to the accused are inadmissible as untrustworthy per se; (3) and thus the trial court's exclusion of this evidence was a mechanistic application of the hearsay rule which was unconstitutional in light of *Chambers* v. *Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297.

From the record it is clear that it was on the basis of the *Stallings* case that the trial court excluded the proffered testimony of Mastracchio and Devlin as to Robichaud's alleged admissions of guilt. Moreover, it is apparent that *Stallings* mandates an exclusion of all third party declarations against penal interest. In *Stallings,* this court stated (pp. 287–88): "We have consistently refused, as a rule of policy which is followed in most jurisdictions, to allow testimony as to hearsay declarations of a third party that he, and not the accused, committed the crime charged against the accused. . . . We see no occasion to depart from our established rule. There can be no denial of the necessity for allowing any reliable evidence tending to prove the innocence of a person accused of crime. But the exclusionary rule is based on the premise that such confessions or admissions do not afford a sufficient assurance of trustworthiness so that the safeguard of cross-examination can safely be dispensed with."

In *Chambers,* which was decided seven years after *Stallings,* the court stated that the hearsay statements involved in that case—the testimony of three witnesses concerning statements made by the declarant McDonald naming himself as the murderer —"were originally made and subsequently offered

at trial under circumstances that provided considerable assurance of their reliability." *Chambers,* supra, 300. The court concluded that the exclusion of this critical evidence which the court reiterated "bore persuasive assurances of trustworthiness" coupled with the trial court's refusal to permit the defendant Chambers to cross-examine McDonald denied Chambers a fair trial. *Chambers,* supra, 302. Thus, since *Chambers* holds that trustworthy third party declarations against penal interest which exculpate the accused and are critical to his defense cannot be excluded as hearsay in mechanical fashion when the declarant is unavailable for cross-examination; *State* v. *Stallings,* supra; is unconstitutional and must be overruled insofar as it excludes evidence of reliable third party declarations against penal interest, exculpatory to a defendant. See *Hodge* v. *Hodge,* 178 Conn. 308, 319, 422 A.2d 280; *Leszczymski* v. *Radel Oyster Co.,* 102 Conn. 511, 528, 129 A. 539.

Nonetheless, even though the trial court, in relying on *Stallings,* mechanically applied the hearsay rule to exclude the testimony of Mastracchio and Devlin as to Robichaud's alleged third party declarations, without considering the trustworthiness of the declarations, the exclusions themselves are not necessarily unconstitutional for the *Chambers* rule extends only to testimony concerning reliable third party declarations.[7]  Nor is the exclusion of the

[7] Courts interpreting *Chambers* v. *Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297, have relied on the Supreme Court's emphasis that the decision was limited to its facts and circumstances and that no new principle of constitutional law was being established. *Chambers,* supra, 302–303. Both federal and state courts have expressed the belief that *Chambers* has not impinged on judicial discretion to exclude unreliable declarations against penal interest. See, e.g., *United States* v. *Barrett,* 539 F.2d 244,

testimony necessarily error since hearsay evidence excluded upon an improper ground would still have been properly excluded if no ground existed for its admission for the truth of the matter asserted therein. See *Chany* v. *Hotchkiss,* 79 Conn. 104, 106, 63 A. 947; Maltbie, Conn. App. Proc. § 36. Since the defendant's sole claim both at trial and on appeal favoring the admissibility of the declarations against penal interest is the constitutional doctrine announced in *Chambers,* the question presently before this court is whether the third party declarations of Robichaud can be deemed trustworthy. We first look to the Supreme Court's decision in *Chambers* to determine what factors we should consider in making this determination.

The court decided in *Chambers* that the facts and circumstances surrounding the third party declarations against interest in that case gave persuasive assurances of trustworthiness because: "First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case— McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon. The sheer number of independent

253 (1st Cir.); *Maness* v. *Wainwright,* 512 F.2d 88, 92 (5th Cir.), cert. granted, 429 U.S. 893, 97 S. Ct. 253, 50 L. Ed. 2d 176, cert. dismissed, 430 U.S. 550, 97 S. Ct. 1593, 51 L. Ed. 2d 630; *United States* v. *Walling,* 486 F.2d 229, 238–39 (9th Cir.), cert. denied, 415 U.S. 923, 94 S. Ct. 1427, 39 L. Ed. 2d 479; *Commonwealth* v. *Carr,* 373 Mass. 617, 369 N.E.2d 970, 975; *Ellison* v. *Commonwealth,* 219 Va. 404, 247 S.E.2d 685, 689; *State* v. *Young,* 89 Wash. 2d 613, 626–27, 574 P.2d 1171.

confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal-interest rationale, each confession [in *Chambers*] was in a very real sense self-incriminatory and unquestionably against interest. . . . Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and had been under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury." *Chambers,* supra, 300–301. (Footnote omitted.)

From these observations expressed by the *Chambers* court, other courts have extracted four general considerations as the keys to a proffered statement's admissibility: "(1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against the declarant's penal interest; (4) the availability of the declarant as a witness." *United States* v. *Guillette,* 547 F.2d 743, 754 (2d Cir.), cert. denied, 434 U.S. 839, 98 S. Ct. 132, 54 L. Ed. 2d 102. See also *United States* v. *Oropeza,* 564 F.2d 316, 325 (9th Cir.); *Henson* v. *United States,* 399 A.2d 16 (D.C. App.); *People* v. *Foster,* 66 Ill. App. 3d 292, 294–95, 383 N.E.2d 788. Although there can be no precise formulation of the proof which would constitute sufficient evidence of the trustworthiness of a third party declaration against penal interest, the considerations derived from *Chambers* indicate the nature of the appropriate inquiry for a trial court faced with the proffer of such a declaration. In requiring that the trustworthiness of a third party declaration against penal interest be examined carefully, we note that the rule we adopt is in accord

with the Federal Rules of Evidence[8] and with the vast majority of jurisdictions which recognize declarations against penal interest as exceptions to the hearsay rule.[9]

The determination as to whether a third party declaration against penal interest is trustworthy is left to the sound discretion of the trial court. *United States* v. *Guillette, supra,* 754; *United States* v. *Barrett,* 539 F.2d 244, 253 (1st Cir.); *Commonwealth* v. *Carr,* 373 Mass. 617, 624, 369 N.E.2d 970; *People* v. *Settles,* 46 N.Y.2d 154, 169, 385 N.E.2d 612; cf. *State* v. *Barlow,* 177 Conn. 391, 396, 418

---

[8] The Federal Rules of Evidence, rule 804 (b) (3) states: "A statement . . . offered to exculpate the accused is not admissible *unless corroborating circumstances clearly indicate the trustworthiness* of the statement." (Emphasis added.) Federal Rules of Evidence, rule 804 (b) (3) may be more inclusive than the *Chambers* due process standard. See *United States* v. *Oropeza,* 564 F.2d 316, 325 (9th Cir.); *United States* v. *Barrett,* 539 F.2d 244, 251 (1st Cir. 1976). But see *Lowery* v. *Maryland,* 401 F. Sup. 604 (D. Md.), affirmed, 532 F.2d 750 (4th Cir. 1976).

[9] See, e.g., *State* v. *Treadaway,* 116 Ariz. 163, 169, 568 P.2d 1061; *State* v. *Larsen,* 91 Idaho 42, 49, 415 P.2d 685; *People* v. *Craven,* 54 Ill. 2d 419, 430–31, 299 N.E.2d 1; *Commonwealth* v. *Carr,* 373 Mass. 617, 623, 369 N.E.2d 970; *State* v. *Higginbotham,* 298 Minn. 1, 4–6, 212 N.W.2d 881; *People* v. *Settles,* 46 N.Y.2d 154, 168–69, 385 N.E.2d 612; *State* v. *Haywood,* 295 N.C. 709, 728–31, 249 S.E.2d 429; *State* v. *Young,* 89 Wash. 2d 613, 626–27, 574 P.2d 1171; *Lhost* v. *State,* 85 Wis. 2d 620, 638–39, 271 N.W.2d 121. These courts have recognized that the unrestricted admission of declarations against penal interest would be to invite perjury of a kind that is most difficult to ascertain. To circumscribe fabrication and ensure the reliability of declarations against penal interest, there must exist circumstances, such as in *Chambers,* which clearly tend to support the facts asserted in the declarations.

But see *People* v. *Edwards,* 396 Mich. 551, 566, 242 N.W.2d 739 ("Cross-examination of the witness, penalties for perjury, and the good sense of the trier of fact . . . are adequate safeguards against false testimony"); see also *Harris* v. *State,* 387 A.2d 1152, 1156 (Md. Ct. Spec. App.) (only in cases "where there is evidence that the out-of-court declaration is untrustworthy, frivolous or collusive should the jury be precluded from receiving and assessing the statement").

A.2d 46; *Ferguson* v. *Smazer,* 151 Conn. 226, 234, 196 A.2d 432. In other circumstances, we might prefer to have the trial court first make this determination; see *United States* v. *Barrett,* supra; but where, as is true here, no further or different proceedings need occur in the trial court;[10] compare *Aillon* v. *State,* 168 Conn. 541, 554, 363 A.2d 49; and the declarations against penal interest at issue are clearly untrustworthy under the standards announced in *Chambers,* we see no reason at this stage in the proceeding to remand and to have the trial court first rule on the trustworthiness of the declarations.

Robichaud's declarations against penal interest are clearly untrustworthy because: First, unlike McDonald's confessions which were definitely made shortly after the murder at issue in the *Chambers* case occurred, Robichaud's alleged confession to Mastracchio took place sometime in the 1970s, the exact time of which Mastracchio could not remember. McDonald's confessions were made to close acquaintances, who because of their closeness could presumably be deemed persons in whom one might reasonably confide; there is no indication in the record that Mastracchio was more to Robichaud than a fellow inmate. Second, unlike *Chambers*

---

[10] As has been noted, for its claim that the alleged third party declarations of Robichaud were admissible, the defendant relied solely on *Chambers* v. *Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297, which determined only that an exclusion of trustworthy third party declarations would, under certain circumstances, be unconstitutional. Thus, we assume, as justified by the record, that no further evidence affecting the trustworthiness of Robichaud's third party declarations was to be offered. See *State* v. *Beaudet,* 53 Conn. 536, 539, 4 A. 237. Moreover, on appeal the defendant has argued at length that the declarations fulfill the trustworthiness criteria recited in *Chambers,* and there has been no suggestion by the defendant that the offers of proof were either incomplete or inadequate to make a determination of the declarations' trustworthiness.

where there was evidence in the case of McDonald's sworn confession, testimony of an eyewitness to the shooting, testimony that McDonald was seen with a gun immediately after the shooting, and proof of his ownership of a gun the caliber of the murder weapon, there was no such corroborating evidence in the present case that placed Robichaud at the scene of the murders of Carmichael and his female companion or that linked Robichaud to those murders. Finally, unlike McDonald, Robichaud was unavailable, because of his death, to be cross-examined.[11] The same considerations and comparisons undermine the trustworthiness of Robichaud's alleged confession to Devlin since it differs insubstantially from the one allegedly made to Mastrac-

---

[11] It should be noted that *Chambers* v. *Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297, because one of the factors it considered to determine the trustworthiness of proffered declarations against penal interest was the availability of the declarant for cross-examination, places a much more difficult burden on a trial court to find untrustworthiness when the trial court's own evidentiary ruling, e.g., finding the "voucher" rule applicable, has created the unavailability. On the other hand, when unavailability results from circumstances like death or absence from the jurisdiction, a showing of trustworthiness is more onerous. Again, it must be remembered that the *Chambers* decision is carefully limited to the facts and circumstances of that case. The *Chambers* court also carefully noted that it was not signaling "any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." Id. 302. In *Chambers* it was the trial court's application of Mississippi's voucher rule coupled with the exclusion of the testimony as to the third party's declarations against penal interest that caused the court to rule that Chambers had been denied a fair trial.

Nonetheless, as we implied by stating that a showing of trustworthiness is just made more onerous when unavailability results from a circumstance like death, no single factor in the test we adopt for determining the trustworthiness of third party declarations against penal interest is necessarily conclusive. All the evidence relevant to each factor should be weighed before a determination is made. The particular circumstances of each case must govern which factor or factors are to be weighed most heavily.

chio. In light of the foregoing discussion, we cannot say that the trial court erred in excluding Mastracchio's and Devlin's testimony as to Robichaud's alleged confessions.

## III

The defendant further claims that the trial court erred in denying the defendant's pro se motion for a mistrial after permitting rebuttal testimony of Robert Burnor concerning the defendant's alleged shooting and serious wounding of Burnor. The defendant contends that this evidence was objected to during the testimony of Burnor at which time the pro se motion for mistrial was made and then denied. The defendant also argues in this appeal that the evidence was inadmissible when examined under the four possible evidentiary areas under which such evidence might be claimed as admissible: credibility, motive, intent, and character; and thus the trial court committed reversible error in denying the defendant's pro se motion for mistrial. Since the record, however, does not support the defendant's contention that the Burnor testimony was in fact objected to, we need not discuss the merits of the defendant's claim. *State* v. *Roy,* 173 Conn. 35, 52, 376 A.2d 391; *State* v. *Grasso,* 172 Conn. 298, 304, 374 A.2d 239. See Practice Book, 1978, § 288.[12]

---

[12] Practice Book, 1978, § 288 (formerly § 226) reads: "Whenever an objection to the admission of evidence is made, counsel shall state the grounds upon which it is claimed or upon which objection is made, succinctly and in such form as he desires it to go upon the record, before any discussion or argument is had. Argument upon such objection shall not be made by either party unless the court requests it and, if made, must be brief and to the point. An exception to the ruling must be taken in order to make it a ground of appeal."

On cross-examination, the defendant Richard DeFreitas admitted that he frequently used guns, but only to frighten people and that he would never use a gun to kill anybody. He acknowledged that he had been in Manchester, New Hampshire in 1969 and left that state because a fight occurred outside the Green Apple Tavern. He testified that he had tried to break up the fight, he was cut on the face and ear for his efforts, one of the parties involved used a gun, and he left New Hampshire right after the imbroglio because he was not in a position to have questions asked. DeFreitas vehemently denied that he had shot the person who cut him. No objection was made to questions eliciting this testimony.

As the last of its eight rebuttal witnesses, the state produced Robert Burnor, who testified that on October 16, 1969 he was shot outside the Green Apple Tavern in Manchester, New Hampshire and swung a knife and cut the man who shot him. Burnor stated that he cut his assailant around the area of the left ear. There was no objection to any of the questions eliciting this testimony. Only at a later time when the state's attorney asked Burnor if he could identify the man who cut him, did defense counsel object on the ground that the witness might not have been qualified to make such an in-court identification. After a voir dire hearing in the absence of the jury, the trial court sustained defense counsel's objection.

At this point, the defendant Donald Brant, now deceased, addressed the court outside of the presence of the jury and stated: "I asked my attorney to object to this evidence, the very fact they were going to put that man on the witness stand. Let the record read on my behalf, speaking for myself,

that all of this whole parade of [rebuttal] witnesses, the cop yesterday, this guy, these other witnesses, the guy from Railroad Salvage, my contention is that's highly prejudicial and a violation of my constitutional rights and if they don't want to object, I'm objecting now, and let the record read that I asked them to object at the onset and they didn't, that's all I got to say. Now you do what you want to do." DeFreitas joined in the objection.

The objection that the evidence was "highly prejudicial" and a violation of "my constitutional rights" is far too sweeping a claim and vague. No specific violation of constitutional rights is clearly indicated. Thus, nothing in the record before us allows us to conclude that the trial court was apprised of a proper objection either at the time Burnor's testimony was introduced or at the time the defendants made their sweeping contentions.[13] See *State* v. *Colton,* 174 Conn. 135, 137–38, 384 A.2d 343; *State* v. *Hawkins,* 162 Conn. 514, 515–16, 294 A.2d 584, cert. denied, 409 U.S. 984, 93 S. Ct. 332, 34 L. Ed. 2d 249.

A short time later the defendants Brant and DeFreitas renewed their argument before the trial court and concluded with a motion for a mistrial which the court denied.

"Mr. DeFreitas: I want to address the court, your Honor, in my own behalf.

The Court: Mr. DeFreitas, the court has sustained your counsel's objection, I don't know particularly now how you can improve on it.

Mr. Brant: What about the damage that has been done? . . .

---

[13] See also footnote 4, *supra.*

Mr. DeFreitas: I'm not debating a ruling, your Honor, what I'm saying in essence before the man got on the stand they should have made some—

Mr. Brant: Some objection.

Mr. DeFreitas: Before he said anything.

Mr. Brant: We asked them to.

Mr. DeFreitas: We didn't have the voir dire, and if he said I shot him and identified me, that would have been it. . . . and every time Mr. Satti does this, the court instructs the record to read, 'Don't hear what you heard, ladies and gentlemen of the jury, disregard the last thing,' for some reason or another. What does that help? The jury already heard it, the implication, the inference is that I shot this man, and I did not shoot this man, but the inference is there. We wanted to object before on the same thing with the Railroad Salvage thing. The same thing with that policeman, I had pleaded guilty to that thing and I got convicted, they are trying me on three different charges here, and I object to the whole line of reasoning here and this is the cart before the horse, here's a man who comes in here, and I'm sorry about your problem, believe me, we've got our problems, but he comes in here and we are put in a position because the attorneys don't object, they get the jury hearing the whole thing and now the court overrules or sustains it, it's too late, your Honor, and I ask for a mistrial, at this time I'm asking for a mistrial.

Mr. Brant: And I join that.

Mr. DeFreitas: The whole thing—

Mr. Brant: There's no way that can be erased, what the jury just heard, the man was shot a few

times, there's still a bullet in his heart, et cetera. The jury has heard that testimony and I maintain the cumulative action of all of that testimony when late objection was made is so prejudicial as to deny us a fair trial at this point and I move the court on my behalf, and he just spoke for himself, for a mistrial or a separate trial at this time, and you can rule against it or do what you want to do.

The Court: Thank you. . . . Your respective pro se motions for mistrials or separate trials are denied."[14]

Viewed in a light most favorable to the defendant DeFreitas and leaving in abeyance the question of whether any motion or request was properly before the court,[15] the defendant's argument on this appeal is that defense counsels' failure to object to the Burnor testimony from its outset caused them sufficient irreparable harm to warrant the granting of a motion for a mistrial. It must be emphasized that the defendant did not ask the trial court to strike Burnor's testimony or offer a curative instruction. He emphatically stated that the trial court could not at this point offer a curative instruction or take any action to erase the effect of having allowed Burnor to testify to this point in the trial. Moreover, on appeal there has been no claim of ineffective assistance of counsel; see, e.g., *State* v. *Marion*, 175 Conn. 211, 397 A.2d 533; *State* v. *McClain*, 171 Conn. 293, 370 A.2d 928; *State* v. *Clark*, 170 Conn.

[14] Before the trial court ruled on the defendants' motions for mistrial, DeFreitas' counsel indicated that his decisions and the decisions of Brant's counsel not to object to certain evidence had been tactical. It is recognized that the decision to object like the decision to cross-examine is often a tactical one. See Keeton, Trial Tactics and Methods (1954), pp. 158-63, 198-205; McCormick, Evidence (2d Ed.), p. 119.

[15] See footnote 4, supra.

273, 281, 365 A.2d 1167; nor at trial was any objection made by the defense to the trial court's charge that Burnor's testimony be considered by the jury only for the purposes of credibility and on the question of motive. On two occasions the trial court in its instructions to the jury admonished them not to consider evidence of other crimes, committed by the defendant DeFreitas, as evidence that he committed the crimes charged against him in the indictment.

A motion for mistrial may be granted if there is an occurrence during trial which results in substantial and irreparable prejudice to the defendant's case. Practice Book, 1978, § 887. It is well settled that the trial court has wide discretion in ruling on motions for a mistrial. *State* v. *Piskorski,* 177 Conn. 677, 720, 419 A.2d 866; *State* v. *Brown,* 169 Conn. 692, 703, 364 A.2d 186; *State* v. *Hafner,* 168 Conn. 230, 247, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74; *State* v. *Savage,* 161 Conn. 445, 449, 290 A.2d 221.

In these circumstances, we cannot say that the trial court abused its discretion in denying the defendant's pro se motion for mistrial when the underlying evidence on which the claim is based was not objected to. To say otherwise would be to deny the trial court the opportunity to take preventative or curative measures to avoid the possibility of a mistrial at a time when those measures were in fact readily available. Cf. *State* v. *Ferraro,* 164 Conn. 103, 106, 318 A.2d 80; *State* v. *Hawkins,* 162 Conn. 514, 517, 294 A.2d 584. Moreover, at trial, counsel could follow one trial strategy and if that approach appeared to be uneventful, the defendant pro se could pursue another opposite tactical course; the trial court would be placed in the

middle of the two opposing positions. Such dual and conflicting strategies are particularly likely when the defendants are as well versed and knowledgeable about criminal procedure and trial tactics as the record indicates that the defendants in this case were.

Even if this court were to assume that, at the point in the proceedings when the defendants made their broad motions for mistrial, a proper objection had been made to Burnor's testimony which would have been the equivalent to a motion to strike, we cannot say that the trial court would have erred in admitting Burnor's testimony. This court has repeatedly faced the question of the admissibility of evidence of a defendant's prior misconduct and has determined that although this type of evidence is inadmissible to prove the guilt of the defendant as to the crime charged; *State* v. *McCarthy,* 179 Conn. 1, 21–22, 425 A.2d 924; *State* v. *Holliday,* 159 Conn. 169, 172, 268 A.2d 368; *State* v. *Harris,* 147 Conn. 589, 599, 164 A.2d 399; such evidence is admissible for other purposes, such as showing intent, an element in the crime, identity, malice, or motive or attacking credibility. *State* v. *McCarthy,* supra; *State* v. *Turcio,* 178 Conn. 116, 129, 422 A.2d 749; *State* v. *Brown,* 169 Conn. 692, 701, 364 A.2d 186. The trial court is left to determine in the exercise of judicial discretion that the probative value of the evidence of other crimes outweighs its prejudicial tendency. *State* v. *Turcio,* supra; *State* v. *Moynahan,* 164 Conn. 560, 597, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219.

Burnor's testimony was certainly relevant in establishing a motive for why the defendant DeFreitas may have felt sufficiently threatened by

Carmichael's female companion's nervousness about her situation to kill both her and Carmichael. The evidence was probative of the fact that the defendant may have feared that if Carmichael's female companion had told all she knew to the police, information about the defendant's involvement in the Green Apple Tavern incident would have come to the police's attention. Ample evidence had been introduced by the state concerning DeFreitas' fears and apprehensions, which had been raised by the unidentified woman's extreme nervousness. This evidence included testimony that after the defendants DeFreitas and Brant had discussed the problem the woman posed, they decided that there was "just too much at stake" and thus had to kill the woman and Carmichael; testimony that the defendants had said that they had to kill the woman because they were afraid she might talk to the police; and testimony that the defendant DeFreitas had replied to a question about the reason for the murders with "You have to think of your own survival."

The seriousness of the incident in New Hampshire was probative of the existence of these concerns on DeFreitas' part. Moreover, any prejudicial tendency that existed in Burnor's testimony was mitigated by the defendant's own testimony as to his life as a professional thief and perpetrator of crimes. Thus, a determination that the probative value of Burnor's testimony outweighed its prejudicial tendency would not have been an abuse of discretion.

There is no error.

In this opinion LOISELLE, BOGDANSKI and HEALEY, Js., concurred. SPEZIALE, J., concurred in the result.