## STATE OF CONNECTICUT *v.* LOGENO BRYANT
## (13016)

PETERS, C. J., HEALEY, SHEA, DANNEHY and CALLAHAN, Js.

Argued November 5, 1986—decision released March 24, 1987

*Kent Drager,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*John F. Cocheo,* assistant state's attorney, with whom was *C. Robert Satti,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. After a trial to the jury, the defendant, Logeno Bryant, was found guilty of sexual assault in the first degree in violation of General Statutes § 53a-70,[1] burglary in the second degree in violation of General Statutes § 53a-102 (a),[2] and unlawful restraint in the first degree in violation of General Statutes § 53a-95.[3] This appeal followed.

On appeal, the defendant claims that the trial court erred in: (1) depriving him of the right to call to the witness stand a third party alleged by the defendant to be the actual culprit and have him invoke the privilege against self-incrimination in the presence of the

---

[1] General Statutes § 53a-70 provides in part: "(a) A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

[2] General Statutes § 53a-102 (a) provides: "A person is guilty of burglary in the second degree when he enters or remains unlawfully in a dwelling at night with intent to commit a crime therein."

[3] General Statutes § 53a-95 provides in part: "(a) A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose the latter to a substantial risk of physical injury."

jury; (2) refusing to allow five witnesses to testify before the jury to declarations against penal interest made by the alleged third party culprit that were exculpatory to the defendant; (3) permitting the deprivation of his constitutional right to due process and to present a defense by allowing the state to impeach his alibi witnesses by "multiple references" to those witnesses' claimed pretrial "silence"; (4) permitting the state to attempt to impeach his own alibi testimony by explicit and repeated references to his postarrest silence; and (5) its jury instructions on circumstantial evidence.

Among the background facts that the jury could reasonably have found are the following. On September 8, 1983, at approximately 1:30 a.m., the victim was asleep in her basement apartment on Dell Avenue in New London. She had fallen asleep without turning off the 19 inch television set in the room. She was awakened by someone touching her arm and saw a black man standing over her. He told her to lie still and then he started to remove her underwear. Her assailant was interrupted by a buzzing sound from the television, the screen of which was "all white snow." He then turned the volume down on the television. Although she tried to get up, he held her arm and he told her to get back into bed. During this time she observed his face. After informing her that he knew that her boyfriend, now her husband, was at work and would not be home until later that morning, the assailant forced her to have sexual intercourse with him. Shortly thereafter, the police were contacted and came to the scene, as did some of the victim's family members. Upon checking her apartment, the victim found that her pocketbook had been taken; among other items in it was her driver's license. An examination of the apartment disclosed that the assailant had apparently entered through a window where the screen had been broken. The police took the victim to the hospital where certain postrape tests were undertaken.

On the day of this incident, the victim told the police, family members and friends that her assailant was a light skinned black man in his early twenties, that he weighed between 160 and 180 pounds, had a kind of muscular build and possessed a deep voice. She said further that he had a small or short afro, had no facial hair and was wearing a light colored tan tank top and cut-off blue jeans. She also noted an odor about him like aftershave or cologne.

The police had the victim view "maybe one hundred slides." Although some of the slides depicted persons with characteristics similar to those of her assailant, she was unable to make a positive identification. Sergeant William C. Gavitt, a New London detective, told the jury that as a result of the investigation of this crime, "one of the Bryants, not specifically Logeno, could be a suspect." The victim later identified the defendant as her assailant from an array of eight photos, although she told Gavitt at that time that she was not 100 percent certain of her identification. A few days later, Gavitt had the victim come to police headquarters because he had received information that the defendant had an appointment in a nearby building on that day.[4] Upon her arrival, Gavitt told the victim that he wanted her to take a walk with him to see if she saw anybody she recognized. She did not recognize any black males that they had passed as they walked along the street. She did, however, identify the defendant as her assailant as he exited the lobby of the building, recognizing him by his deep voice and the distinct odor

---

[4] At a prior hearing held in the absence of the jury, Gavitt had testified that he had learned from Elizabeth Schafer, the defendant's probation officer, that the defendant had an appointment with her at her office in downtown New London. It was arranged that, upon the completion of that appointment, the probation officer would proceed downstairs in her office building to the lobby with the defendant. Schafer and the defendant, who was with another black man, came down into the lobby. The defendant was speaking at the time the victim recognized him.

of his aftershave. During the trial, she also identified the defendant as her assailant when he was sitting not at the defense table but in the audience among several other black males he had chosen.[5]

At the time of the crimes involved, the Bryant family lived at 57 Henry Street in New London. The family consisted of Audrey Bryant and her three sons, Eugene, the defendant and Timothy. The Bryant residence is between 110 and 130 yards away from the victim's apartment building on Dell Avenue. In August,

---

[5] Prior to trial, the defendant filed a motion seeking a lineup in anticipation of the probability that the victim would be asked to identify her assailant in court. During argument on this motion, the defense asked that the lineup requested be conducted outside the presence of the jury. The court denied that request. Defense counsel then asked the court to permit a lineup in the presence of the jury or as a "last alternative . . . other than a lineup," he asked that the identification process be conducted with "the defendant [being] allowed to be seated away from [the counsel] table with individuals of similar characteristics." The court granted this request. The court permitted the defendant to select "[n]o more than four" individuals and permitted him to have his brother Eugene in that group. Defense counsel informed the court that Eugene was not present but that he would immediately attempt to subpoena him to obtain his presence for the proposed in-court identification procedure. A recess was taken to permit the defendant to procure those he wished to sit with him during this procedure. When court reconvened, the state, in the presence of the jury, called the victim as its first witness. During its direct examination, she was shown an array from which she had selected the defendant's photo. She identified the photo of the defendant which she had previously selected from that array. After the state further examined the victim, the state then asked her if she saw her assailant in the courtroom. Thereupon, defense counsel asked that the jury be excused and the trial court so ordered. In its absence, counsel objected to the photo array arguing, inter alia, that the proposed in-court identification would be "unduly suggestive and unreliable" because the victim had had the "opportunity while on the witness stand to just view the photo display approximately fifteen minutes ago." The court overruled the objection. The jury returned and the victim was escorted around the courtroom. When she returned to the witness stand, the state asked her, "based solely on [her] recollection of the events that occurred on September 8, 1983," if she could identify her assailant. The victim then identified the defendant.

We note that the transcript of the trial does not expressly indicate whether Eugene Bryant was in the courtroom at that time.

1984, shortly before trial, another tenant at 57 Henry Street found the victim's driver's license in his garage on the premises. It was turned over to the New London police on August 18, 1984.

Those additional circumstances relevant to the defendant's claims of error will be set out below as they become necessary.

# I

We turn first to the defendant's claims involving his third party culprit defense. At trial, the defendant presented an alibi defense and claimed that his brother, Eugene Bryant, in fact committed the crime with which he was charged. He therefore claims that the trial court erred in denying him the right to call Eugene Bryant to the witness stand and have him invoke his privilege against self-incrimination in the presence of the jury. In making this claim, he acknowledges that he does so against the majority view as set out in the leading case of *Bowles* v. *United States,* 439 F.2d 536 (D.C. Cir. 1970), cert. denied, 401 U.S. 995, 91 S. Ct. 1240, 28 L. Ed. 2d 533 (1971). He also argues that the general rule against prosecutorial use of a privilege-invoking witness against the defendant "simply" does not apply when it is the defendant who wishes to call such a witness. While recognizing that the jury could draw "a variety of . . . inferences" from the alleged third party culprit's invocation of the privilege, he maintains that, given his constitutional right to call witnesses and present a defense, he had the right to have the jury determine which inference to draw. He is aware that basic to the majority position, as set out in *Bowles*, is that the defense should not be permitted to do this because such evidence would have a prejudicial impact on the prosecution's case. He maintains that the probative value of the witness' invocation outweighs its prejudicial impact.

*Bowles* identifies two forms of prejudice: (1) the defense is permitted to use evidence not subject to cross-examination by the state; and (2) the invocation of the privilege would have a "disproportionate impact" on the jury. *Bowles* v. *United States,* supra, 541–42. This claimed prejudice, the defendant claims, is "vastly over-stated." In the event that no right of the defendant to require a witness to invoke his self-incrimination privilege in the presence of a jury is found, his alternative position is that the trial judge erred in refusing to allow him to call Eugene to have him answer, in the presence of the jury, those questions that he willingly answered on the voir dire[6] so that the jury could at least observe him.

---

[6] After the state had rested, the defendant indicated to the trial court that he intended to call Eugene to the witness stand, although he had good reason to believe that Eugene would invoke his fifth amendment privilege against self-incrimination. Arguing that the jury had heard about him in the state's case, he wanted the jury to "at least see [Eugene]," saying that that did not come under his fifth amendment right and that he "want[ed the jury] to have the opportunity to view Eugene Bryant as far as similarities." The trial court sustained the state's objections to these proposals. Immediately thereafter, Eugene, who had the services of an assistant public defender who was present, testified on the voir dire in the absence of the jury. Although he invoked his fifth amendment privilege on at least nine questions, he did answer the following questions placed by defense counsel:

"Q. Mr. Bryant, can you tell us if you are related to Logeno Bryant?
"A. No—oh, my brother, yes. I'm sorry.
"Q. You're his brother, are you not?
"A. Yes.
"Q. And can you tell us your mother's name?
"A. Audrey Bryant.
"Q. And can you give us your age?
"A. I'm twenty-two years old.
"Q. And your height?
"A. Approximately 5'9", 5'10".
"Q. And how about your weight?
"A. About 165.
"Q. Mr. Bryant, do you know where Dell Avenue is in New London?
"A. Yes, I do.
"Q. And do you know where 57 Henry Street is in New London?

The rule of *Bowles* v. *United States,* supra, rests on the conclusion that to allow the defense to call such a witness permits the party calling the witness to bolster its case out of inferences arising from the use of the privilege. See also *Namet* v. *United States,* 373 U.S. 179, 180, 83 S. Ct. 1151, 10 L. Ed. 2d 278 (1963). One court put it this way: "Neither side has the right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him." *United States* v. *Lacouture,* 495 F.2d 1237, 1240 (5th Cir.), reh. denied, 503 F.2d 568 (5th Cir.), cert. denied, 419 U.S. 1053, 95 S. Ct. 631, 42 L. Ed. 2d 648 (1974); *Bowles* v. *United States,* supra, 541. "The rule is grounded not only in the constitutional notion that guilt may not be inferred from the exercise of the Fifth Amendment privilege but also in the danger that a witness's invoking the Fifth Amendment in the presence of the jury will have a disproportionate impact on

---

"A. Yes, I do.
"Q. And have you ever lived at 57 Henry Street in New London?
"A. Yes, I have.
"Q. What?
"A. Yes.

\* \* \*

"Q. But, I believe from your testimony you do know and, indeed, are related to the Defendant, Logeno Bryant, and your mother, Audrey Bryant?
"A. Yes. . . .
"Q. Okay, and lastly, Mr. Bryant, can you tell us if you know Detective William C. Gavitt of the New London Police Department?
"A. Yes, I do.
"Q. Can you tell us if you know, sir, whether or not you know Detective T. K. Brown of the New London Police Department?
"A. By sight. I don't know—I don't think I know him."
The trial court then stated that it would allow Eugene to answer, in the presence of the jury, those questions to which he did not invoke his fifth amendment privilege. The state objected to this on the ground of relevancy. The defendant claimed it was "very relevant" to let him answer these questions. The court sustained the state's objection. At that point in the trial, the defendant had not yet made his claim on the issue of Eugene's declarations against penal interest which, as indicated below, adduced additional evidence of his alleged involvement in the crime.

their deliberations. . . . In reality the probative value of the event [invoking the privilege] is almost entirely undercut by the absence of any requirement that the witness justify[7] his fear of incrimination and by the fact that it is a form of evidence not subject to cross-examination." *Bowles* v. *United States,* supra, 541–42.

We do not agree with the defendant in this case that the prejudice claimed by permitting a witness to be called by the defendant to invoke the fifth amendment before the jury is "vastly overstated." Neither side has the right to benefit from inferences capable of being drawn by the jury where the privilege is invoked by the witness. See, e.g., *United States* v. *Beechum,* 582 F.2d 898, 909 n.10 (5th Cir. 1978), cert. denied, 440 U.S. 920, 99 S. Ct. 1244, 59 L. Ed. 2d 472 (1979). Reason and human experience indicate that inferences are certainly suggested by such a tactic; the danger inherent in this circumstance is that the inference or inferences drawn may have little, if any, juristic relation to the issues before the jury. More important, however, is the fact that the inference, whatever it may be, cannot be attacked effectively by cross-examination.

The defendant counters the state's argument by claiming in this case the primacy of his sixth amendment rights to bring witnesses before the jury, to present a defense and to compulsory process.[8] We do

---

[7] We believe this to be correct, keeping in mind that it is the duty of the judge, and not the witness or counsel, to determine whether a witness can properly assert the privilege against self-incrimination. *Hoffman* v. *United States,* 341 U.S. 479, 486, 71 S. Ct. 814, 95 L. Ed. 1118 (1951). Despite this obligation of the judge, there are limitations, both prudential and practical, beyond which we realize that a judge in a given case may not go if for no other reason than that the privilege is to be accorded liberal construction in favor of the right it is intended to secure. Id.

[8] While the defendant suggests that the trial court's ruling on this issue violated his state, as well as his federal, constitutional rights, we need not address the claim under our state constitution for the reasons cited in *State* v. *Chung,* 202 Conn. 39, 45 n.7, 519 A.2d 1175 (1986). See *State* v. *Toste,* 198 Conn. 573, 576 n.3, 504 A.2d 1036 (1986).

not agree. It is true that "[t]he right to offer the testimony of witnesses . . . is in plain terms the right to present a defense, [and] the right to present the defendant's version of the facts . . . ." *Washington* v. *Texas,* 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). While this sixth amendment right is binding upon the state through the fourteenth amendment, it is also established that "the right to confront and to cross-examine [witnesses] is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers* v. *Mississippi,* 410 U.S. 284, 295, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).[9] The fifth amendment privilege against self-incrimination is one of those interests. See, e.g., *Davis* v. *Alaska,* 415 U.S. 308, 320, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *Alford* v. *United States,* 282 U.S. 687, 694, 51 S. Ct. 218, 75 L. Ed. 624 (1931); *United States* v. *Roberts,* 503 F.2d 598, 600 (9th Cir. 1974), cert. denied, 419 U.S. 1113, 95 S. Ct. 791, 42 L. Ed. 2d 811 (1975); *Commonwealth* v. *Francis,* 375 Mass. 211, 214–15, 375 N.E.2d 1221, cert. denied, 439 U.S. 872, 99 S. Ct. 205, 58 L. Ed. 2d 185 (1978).

In addition to the reasons set out in *Bowles* prohibiting the defendant from calling a witness for the sole purpose of having him invoke his privilege against self-incrimination before the jury, the sixth amendment right to call a witness must be considered in the light of its purpose, namely, to produce testimony for the defendant. See *Washington* v. *Texas,* supra; *United States* v. *Roberts,* supra. Calling a witness who will refuse to testify does not satisfy that purpose. The defendant had the right to elicit only *nonprivileged* tes-

[9] The United States Supreme Court has invoked the sixth amendment to reverse a conviction where a state's witness' refusal to answer on fifth amendment grounds added critical weight to the state's case in a manner not subject to cross-examination. See *Douglas* v. *Alabama,* 380 U.S. 415, 417, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965).

timony from Eugene. See *United States* v. *Arnott*, 704 F.2d 322, 325 (6th Cir.), cert. denied, 464 U.S. 948, 104 S. Ct. 364, 78 L. Ed. 2d 325 (1983).

While we can imagine a case in which a defendant's constitutional right to call witnesses on his behalf might arguably require that a witness who refuses to testify be called, this is not such a case. The evidence that was before the jury at the time the defendant attempted to call Eugene strongly suggested the applicability of the *Bowles* rationale. Despite the defendant's argument to the contrary, a careful review of the transcript discloses that at the time the defendant sought to call Eugene to the witness stand for the purpose of having him invoke his privilege the jury had before it little evidence implicating Eugene as the third party culprit. The jury had heard Gavitt testify that as a result of the investigation, "one of the Bryants, not specifically Logeno, could be a suspect." The jury also had heard Roy L. McDaniel, the F.B.I. fingerprint expert, testify that the New London police had furnished him with certain latent prints from the scene of the crime as well as known prints of both the defendant and Eugene. His comparison, he said, disclosed that none of these latent prints were those of the defendant or Eugene. While there had been evidence that the victim's driver's license was found in a garage where the Bryants lived, it had not been tied specifically to Eugene. The evidence which tended to implicate Eugene in the Dell Avenue incident, including his "inculpatory" statement to Audrey Bryant, his absence from his home at or about the time of the crimes charged against the defendant and his possession of the victim's purse in the presence of witnesses later offered by the defendant, which was excluded in large measure by the trial court, was offered *after* the defendant's attempt to have Eugene testify before the jury.

The trial court, therefore, did not err in refusing to allow the defendant to call Eugene simply to have him invoke his fifth amendment rights.

The trial court did, however, commit harmful error in refusing to permit the defendant to have Eugene testify before the jury to answer those questions that he willingly answered on the voir dire without any invocation of the privilege.[10] After the court had refused to permit the defendant to call Eugene for the purpose of having him invoke the privilege in the presence of the jury, the defendant sought to call him to testify as to those questions that he willingly had answered on the voir dire. The state objected, claiming that the evidence was irrelevant. The court sustained the objection but pointed out that the defendant could, if he wished, recall Eugene if relevancy were to be established thereafter. The defendant argued that relevancy already had been demonstrated. We agree with the defendant.

" 'No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason and judicial experience. *Eason* v. *Williams,* 169 Conn. 589, 591, 363 A.2d 1090 [1975]; *State* v. *Towles,* 155 Conn. 516, 523, 235 A.2d 639 [1967].' *State* v. *Runkles,* 174 Conn. 405, 413, 389 A.2d 730, cert. denied, 439 U.S. 859, 99 S. Ct. 177, 58 L. Ed. 2d 168 (1978). We have noted that ' "[e]vidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in con-

---

[10] Because we find harmful error on this ruling, we need not address the defendant's related claim that he had a right to call Eugene to the witness stand solely to give the jury the opportunity "to at least view [Eugene] before he invoked his Fifth Amendment privilege." The jury will have that opportunity on the new trial ordered in this case.

nection with other facts, renders the existence of the other either certain or more probable. Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue. . . . *State* v. *Towles,* [supra]; *Pope Foundation, Inc.* v. *New York, N.H. & H. R. Co.,* 106 Conn. 423, 435, 138 A. 444 [1927]." ' *State* v. *Villafane,* 171 Conn. 644, 674–75, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977)." *State* v. *Gold,* 180 Conn. 619, 645–46, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980).

Although a court has wide discretion in its rulings on the relevancy of evidence; *State* v. *Sharpe,* 195 Conn. 651, 659, 491 A.2d 345 (1985); *State* v. *DeForge,* 194 Conn. 392, 396, 480 A.2d 547 (1984); *State* v. *Runkles,* supra; " ' "[i]t is always competent for a [defendant] to [present] evidence tending to show that another committed the crime [with] which he is charged . . . . " ' *State* v. *Marshall,* 166 Conn. 593, 601, 353 A.2d 756 (1974)." *State* v. *Gold,* supra, 646. The trial court abused its discretion in concluding that the questions which Eugene had voluntarily answered on the voir dire without invoking his privilege were irrelevant. That evidence was clearly relevant. Significantly, Eugene's self-description was consistent with that given by the victim and several state witnesses to whom she had described her assailant. He knew where the victim's home was located and at the time of the crimes, both the defendant and Eugene lived at 57 Henry Street, the same address where the victim's driver's license was later found. Additionally, he was one of the two Bryant brothers who Gavitt had said were suspects during the police investigation. His appearance before the jury would have given the jurors the opportunity to evaluate that answer as well as to observe him and determine whether the victim may have mistakenly

identified[11] the defendant as the actual culprit. The exclusion of this evidence was erroneous. See *State* v. *Runkles, supra.* Given the significance of the identity of the actual assailant, we conclude that, under the circumstances, the exclusion of the proffered testimony was also harmful; a new trial is necessary.

## II

The defendant next claims that the trial court erred in refusing to allow him to call five witnesses who could testify to declarations against penal interest by Eugene Bryant that were exculpatory to the defendant and inculpatory to Eugene. We agree with the defendant.

To analyze this claim of error, certain additional background circumstances should be set out. In moving for the admissibility of this testimony, the defendant made a long offer of proof in the absence of the jury, at which time the five witnesses testified. This hearing took place after the trial court had refused to permit Eugene to testify before the jury and after Joanne Mounts and her husband, Donald, had testified before the jury. The Mounts lived at 43 Henry Street in New London and were friends of the Bryant family. On the night of September 7, 1983, they both attended a get-together at the Bryants' home because it was Audrey's birthday. Joanne Mounts testified that she had arrived there about 6:30 p.m. that evening and stayed until she and her husband left[12] between 1:30 and 1:45 a.m. on the

---

[11] The state argues that the trial court's ruling of irrelevancy was correct because there were three positive identifications of the defendant by the victim as her assailant. We do not agree. This argument appears to contend that a criminal defendant's right to introduce evidence that a person other than himself committed the crime; see *Chambers* v. *Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *State* v. *Gold,* 180 Conn. 619, 646, 431 A.2d 501 (1980); is diminished, if not eliminated, where the state's case has adduced strong identification evidence. This simply is not so.

[12] Donald Mounts testified that he was at the Bryants' house until "[n]o later than 1:30 [a.m. on September 8, 1973]."

morning of September 8, 1983. She also said that the defendant had been there all the time and that she had never seen him leave the house. She said that she did not see Eugene "all evening" and that she did see a young man named "Eddie" there but was not sure if he was there when she left. Donald Mounts said that he saw the defendant there and never saw him leave the house. He did see the defendant go into an adjoining bedroom and saw him for the last time "probably around 12:30 [a.m.]." In addition, he saw "Shawn" and a young woman named "Sheri," but recalled nobody else being there.

Thereafter,[13] a hearing was held in the absence of the jury at which the following witnesses testified: New London detective Terry K. Brown, the defendant, Audrey Bryant, Shawn Guess and Keith Perry. Brown testified that in approximately May, 1984, after the crime and before the trial, Eugene approached him, and after being advised of his constitutional rights, told Brown that he had burglarized the apartment on Dell Avenue and had taken the woman's pocketbook. He did not, however, indicate that he had assaulted her. The defendant testified that in the early morning of September 8, 1983, he was in his room accompanied by Shawn Guess and Eddie Johnson[14] when Eugene

[13] Just prior to this hearing and after the Mounts' testimony, the defendant again attempted to have Eugene testify before the jury. He sought his testimony not only on his penal interest claim but, barring that, he again asked the trial court to permit at least his testimony before the jury on those questions to which earlier he had not invoked his privilege against self-incrimination. On the voir dire at that time, the defendant asked questions on this penal interest claim for which Eugene did claim the privilege. The defendant then renewed his claim that Eugene be permitted to answer, before the jury, those questions to which he had not earlier claimed the privilege. The trial court then noted that it would withhold its ruling until after the defendant's offer of proof on the declarations against penal interest and its ruling on that offer. The trial court did not, thereafter, permit Eugene to testify or appear before the jury.

[14] He also said that Eddie Johnson was there when Eugene came in with the purse but that he "wouldn't say [Eddie Johnson] was in the [defendant's] room" when he actually made the inculpatory statements.

arrived carrying a purse. At that time, Eugene went through the purse, and the defendant saw the driver's license. In addition, Eugene told them that he had just broken into a house on Dell Avenue, that the woman "was laying there [and that he] could have raped her." The defendant testified that Eugene made this statement "more than five times." Guess said that he was at the Bryant home on the night of Audrey's birthday party and that he saw Eugene with a pocketbook. Guess also said that Eugene had just come from an apartment down the street where he had taken the pocketbook. Perry, who knew both Eugene and the defendant, indicated that more or less toward the end of the summer in 1983 Eugene asked him if he wanted to break into an apartment on Dell Avenue. Eugene, however, did not subsequently say anything to Perry about the incident.

Audrey Bryant said that on the night the defendant was arrested, her son Eugene told her that the defendant did not go into the Dell Avenue house but that he had done so. He told her that he went in through the window and took the woman's purse but that "he never touched her." She testified that he also said that "he would tell the truth when the time came." She went on, however, to say that since the trial "[had] been going on," Eugene said that he would not tell the truth. He also said, she related, that he would lie in court.

It is with this background that the defendant claims the trial court committed reversible error both as a matter of evidentiary law and as a deprivation of his federal and state constitutional rights to present a defense including a third party culprit defense. Citing *Chambers* v. *Mississippi,* supra, he argues initially that exclusion of this evidence contravened the exception to the hearsay rule that we adopted in *State* v. *DeFreitas,* 179 Conn. 431, 450, 426 A.2d 799 (1980), which provides for the admissibility of trustworthy declarations against

penal interest where the declarant is unavailable. The state counters, arguing that the trial court correctly determined that the testimony of the defendant's witnesses did not establish the threshold showing of trustworthiness, a prerequisite to admissibility. In claiming that this ruling was correct, the state refers to the testimony of the five witnesses, pointing out such things as "likely" fabrication, lack of corroboration, the fact that the witnesses are close acquaintances of the defendant, serious credibility problems and the timing of the declarations. It also argues that the conflicting testimony of these witnesses, as well as the "selective" declarations of Eugene, where he allegedly only admitted the burglary of the apartment on Dell Avenue but not the sexual assault on the victim, obviously concerned the trial court. We agree with the defendant that it was error not to have admitted the evidence proffered as declarations against Eugene's penal interest under *State* v. *DeFreitas,* supra.[15]

In *State* v. *DeFreitas,* supra, 450–51, we adopted a rule, consistent with *Chambers* v. *Mississippi,* supra, and in accord with rule 804 (b) (3)[16] of the Federal Rules of Evidence, which provides that trustworthy third party statements against penal interest which are exculpatory to the defendant are admissible if the declarant is unavailable. *State* v. *Gold,* supra, 630; "A statement exculpatory to a defendant is one which

---

[15] Because we dispose of this claim on evidentiary grounds, we need not address this claim on federal or state constitutional grounds. See *State* v. *Gold,* 180 Conn. 619, 639–40, 431 A.2d 501 (1980).

[16] Rule 804 (b) (3) of the Federal Rules of Evidence provides: "A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

either exonerates or which might reduce the degree of punishment to which the defendant might be exposed even if the remark does not completely exonerate the defendant." *State* v. *Gold,* supra, 630 n.5. In this case, the excluded evidence clearly was exculpatory to the defendant.

Our rule requires, as does the federal rule, that the trustworthiness of such proffered statements be examined carefully. Id., 630. Rule 804 (b) (3) of the Federal Rules of Evidence "requires that 'corroborating circumstances clearly indicate the trustworthiness of the statement' before the statement is admissible to exculpate the accused." *State* v. *Gold,* supra, 630–31. In determining whether "the threshold level of trustworthiness [is] satisfied"; id., 630; the trial court does not have to find it to be "absolutely trustworthy" because if this were so, "the province of the jury as the finder of fact and weigher of credibility would be entirely invaded." Id., 632.

"Courts have extracted from *Chambers* four general considerations relevant to an investigation of the trustworthiness of a third party confession: '(1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against the declarant's penal interest; [and] (4) the availability of the declarant as a witness.' *United States* v. *Guillette,* 547 F.2d 743, 754 (2d Cir. 1976), cert. denied, 434 U.S. 839, 98 S. Ct. 132, 54 L. Ed. 2d 102 (1977); see also *United States* v. *Oropeza,* 564 F.2d 316, 325 (9th Cir. 1977), cert. denied, 434 U.S. 1080, 98 S. Ct. 1276, 55 L. Ed. 2d 788 (1978); *Henson* v. *United States,* 399 A.2d 16 (D.C. App.), cert. denied, 444 U.S. 848, 100 S. Ct. 96, 62 L. Ed. 2d 62 (1979); *People* v. *Foster,* 66 Ill. App. 3d 292, 294, 383 N.E.2d 788 (1978). We have recognized that while there can be 'no precise formulation of the proof which would con-

stitute sufficient evidence of the trustworthiness of a third party declaration against penal interest, the considerations derived from *Chambers* indicate the nature of the appropriate inquiry for a trial court faced with the proffer of such a declaration.' *State* v. *DeFreitas,* supra, 451." *State* v. *Frye,* 182 Conn. 476, 479–80, 438 A.2d 735 (1980). No single factor for determining trustworthiness, however, is "necessarily conclusive." *State* v. *DeFreitas,* supra, 454 n.11; see *State* v. *Gold,* supra, 633–34. The determination whether a third party declaration against penal interest is trustworthy lies in the sound discretion of the trial court. *State* v. *DeFreitas,* supra, 452, and cases there cited.

It is necessary to the use of the penal interest exception that the declarant be unavailable. *State* v. *Conroy,* 194 Conn. 623, 630, 484 A.2d 448 (1984); *State* v. *Frye,* supra, 480–81; *State* v. *Gold,* supra, 630; *State* v. *DeFreitas,* supra, 440–42. As in *Frye,* we employ the definition set out in rule 804 (a) of the Federal Rules of Evidence in determining the availability of the declarant as a witness. See *State* v. *Frye,* supra, 481–82. It needs no elaboration to conclude that Eugene was "unavailable" under rule 804 (a) (1) which defines "unavailability as a witness" to include situations where the declarant "is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement." See, e.g., *State* v. *Smith,* 415 A.2d 553, 559 (Me. 1980).

Next, we must determine the extent to which the proffered declarations[17] are really against the penal interest of the declarant. Preliminarily, we note one argument advanced by the state against this claim. The trial court held, and the state on appeal argued that, given the charges against the defendant of burglary

[17] This encompasses the evidence offered through the five witnesses who testified on the voir dire.

and sexual assault, Eugene's "admission" of the burglary alone is a "kind of selective declaration against penal interest . . . [that] casts doubt upon the offense [of sexual assault] as to which there is no admission against penal interest." This "selective declaration" view undoubtedly concerned the court in its ruling. It should not have in this case.

In *State* v. *Gold,* supra, 642, we stated that "[w]e are persuaded of the logic and soundness of [federal rule 804 (b) (3)] and the trend to reject a narrow and inflexible definition of a statement against penal interest in favor of a definition which includes not only confessions, but other remarks which would tend to incriminate the declarant were he or she the individual charged with the crime." See also *State* v. *DeFreitas,* supra, 451. The "against interest" exception is not limited to a defendant's direct confession of guilt. See, e.g., *United States* v. *Alvarez,* 584 F.2d 694, 699–700 (5th Cir. 1978); *United States* v. *Barrett,* 539 F.2d 244, 251 (1st Cir. 1976); *Commonwealth* v. *Keizer,* 377 Mass. 264, 270, 385 N.E.2d 1001 (1979). It applies as well to statements that "tend" to subject the speaker to criminal liability. *United States* v. *Palumbo,* 639 F.2d 123, 127–28 (3d Cir.), cert. denied, 454 U.S. 819, 102 S. Ct. 100, 70 L. Ed. 2d 90 (1981); *United States* v. *Alvarez,* supra, 700. The rule "encompasses disserving statements by a declarant that would have probative value in a trial against the declarant." *United States* v. *Thomas,* 571 F.2d 285, 288 (5th Cir. 1978). Considered in context, the term "tend" in rule 804 (b) (3) reaches in a proper case as "against interest" remarks that strengthen the impression that the declarant had an insider's knowledge of the crimes. *United States* v. *Palumbo,* supra, 132; *United States* v. *Alvarez,* supra; *United States* v. *Barrett,* supra, 252. This is quite compatible with McCormick's statement: "As to what is against penal interest, quite obviously the essential characteristic is

the exposure to risk of punishment for a crime." C. McCormick, Evidence (2d Ed. 1978 Sup.) § 278, p. 83; see *State* v. *DeFreitas,* supra. 447 n.6. Moreover, "it is not the fact that the declaration is against interest but the awareness of that fact by the declarant which gives the statement significance." B. Jefferson, "Declarations against Interest: An Exception to the Hearsay Rule," 58 Harv. L. Rev. 1, 17 (1944).

In this case, there were at least four direct statements by Eugene that he had committed the burglary with which the defendant had been charged. These were "in a very real sense self-incriminatory and unquestionably against interest." *Chambers* v. *Mississippi,* supra, 301. Although there was no direct statement, let alone a direct confession, to the sexual assault charge, the context in which he had made the statements concerning the burglary, as disclosed by the voir dire, fairly viewed, indicates that he had an insider's knowledge of the crimes and implied his personal participation. The victim had already testified that her assailant had taken her pocketbook *after* he had assaulted her sexually, that both the burglary and sexual assault had been committed by the same man and that only *one* person had been present in her apartment when these crimes were committed.

In vacuo, one might contend that Eugene's silence as to the latter charge after direct admissions to the former has self-interest connotations and thus any statement short of a complete confession to both crimes should not be admitted into evidence. Any such claim, however, lacks merit in this case. We are aware that the dilemma posed by statements that contain components that are both disserving, "against interest," and self-serving to the declarant has not always been resolved in the same manner.[18] Our view is that where

---

[18] The problem of statements that are both disserving and self-serving to a declarant has divided commentators and some courts. One view, with

the disserving parts of a statement are intertwined with self-serving parts, it is more prudential to admit the entire statement and let the trier of fact assess its evidentiary quality in the complete context. See 2 F. Wharton, Criminal Evidence (14th Ed. 1986) § 295. There are cases, and this is one, where allowing such latitude to contextual statements may give real meaning to the declaration that is disserving. In any event, Eugene's declaration included an admission that he had been in the victim's apartment when she was in bed and that he had the opportunity to rape her. These statements were consistent with other excluded evidence that he was away from his home at the time of the offense. The argument that his direct confessions to the burglary and his neutrality as to the sexual assault suggest an improper motive to involve himself just enough to help the defendant but not enough to inculpate himself on the sexual assault, under the circumstances of this case, is no bar to admissibility. The claim that the declarations were selective bears on the appropriate weight to be given the evidence and not its admissibility. See *State* v. *Abrams,* 140 N.J. Super. 232, 356 A.2d 26 (1976), aff'd, 72 N.J. 342, 370 A.2d 852 (1977); 5 J. Wigmore, Evidence (Chadbourn Rev. 1974) § 1464, p. 338 and n.3. The declarations of Eugene Bryant were against his penal interest. See, e.g., *State* v. *Gold,* supra, 641; C. McCormick, Evidence (3d Ed.) § 278, p. 824.

---

which we are inclined to agree, would admit the entire statement. 5 J. Wigmore, Evidence (Chadbourn Rev. 1974) § 1465, p. 339. A somewhat different view suggests admitting only the disserving portion of the declaration and excluding the self-serving part where the two parts can be severed. C. McCormick, Evidence (2d Ed.) § 279, p. 677. The reasoning is that self-serving statements cannot by definition be statements against interest. Contrast *United States* v. *Barrett,* 539 F.2d 244, 252 (1st Cir. 1976) (admitting both inculpatory and collateral parts), with *People* v. *Leach,* 15 Cal. 3d 419, 441–43, 541 P.2d 296, 124 Cal. Rptr. 752 (1975) (excluding any part not specifically disserving).

The next of the four considerations from *Chambers* for determining trustworthiness is the time of the declaration and the party to whom the declaration was made. *State* v. *Gold,* supra, 633. The statement to Guess was claimed to have been made in the early morning hours of September 8, 1983, within an hour or two after the burglary of the apartment on Dell Avenue after Eugene had returned to his home with the stolen pocketbook which contained, inter alia, the victim's driver's license. The statement to his mother was made on the very day that the defendant was arrested for the crimes charged. His oral declaration to Brown was made both in the courthouse and in the police station in May, 1984, on the day of a court hearing involving this case and after the police had advised him of his constitutional rights. Eugene's statement to Perry soliciting Perry's willingness to join him in a possible break-in of the victim's apartment on Dell Avenue was made in the summer of 1983 *just preceding* the actual burglary of that apartment. With reference to the timing of the statement to Perry, the fact that the statement was made prior in time to the incident involved tends to show that the declarant "had no probable motive to falsify or misstate the fact declared, which is generally shown by proof that it was made ante litem motam [before the controversy]." *Smith* v. *Hanson,* 34 Utah 171, 175, 96 P. 1087 (1908).

The statements made by Eugene to each of these five persons are temporally significant. On each occasion, they appear to be spontaneous and unsolicited. At the time he made the statements to his mother, the defendant, Guess and Brown, he stood to gain nothing and he must have been aware that such disclosure might lead to criminal prosecution against him. See *Chambers* v. *Mississippi,* supra. His earlier importuning of Perry, evidencing his predisposition to commit the crime, is also not without significance, given the actual burglary of the apartment on Dell Avenue.

We recognize that the focus on time appears to arise from the belief that declarations made soon after the crime suggest more reliability than those made after a lapse of time where a declarant has a more ample opportunity for reflection and contrivance. See, e.g., *United States* v. *Guillette,* 547 F.2d 743 (2d Cir. 1976), cert. denied, 434 U.S. 839, 98 S. Ct. 132, 54 L. Ed. 2d 102 (1977) (declaration made four months later too attenuated and remote to assure reliability). In *Chambers,* assurances of reliability were found in the circumstance that the defendant's confessions were made "spontaneously to a close acquaintance shortly after the [crime] had occurred." *Chambers* v. *Mississippi,* supra, 300. In this case, unlike many others, in which such a declaration was made only to one other person, the defendant offered, the state opposed and the trial court relied on the excluded evidence as a whole—evidence which identified a time continuum from a time apparently shortly before the crime involved to the night of the crime on September 8, 1983, to the date of the defendant's arrest on October 14, 1983, and to the May, 1984 date of the defendant's preliminary hearing. It is appropriate that we do the same. In context, this time span does not attenuate the temporal aspect of our inquiry into trustworthiness.

The persons to whom Eugene made the statements also serve to contribute to their reliability. "Acknowledgement of criminal activity is generally made only to confidants or to persons in whom the declarant imposes trust." *United States* v. *Goins,* 593 F.2d 88, 91 (8th Cir.), cert. denied, 444 U.S. 827, 100 S. Ct. 52, 62 L. Ed. 2d 35 (1979); see *Chambers* v. *Mississippi,* supra; *State* v. *Gold,* supra, 634; *State* v. *DeFreitas,* supra, 453. It is fair to say that Eugene's mother, the defendant, Guess and Perry come within this category. As to his statement to Brown, one recalls the statement of Chief Justice Warren Burger in *United States*

v. *Harris,* 403 U.S. 573, 583, 91 S. Ct. 2075, 29 L. Ed. 2d 723 (1971): "People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions."

Our inquiry concerning trustworthiness next requires that we determine whether there existed " 'corroborating circumstances [which] clearly indicate the trustworthiness of the statement.' " *State* v. *DeFreitas,* supra, 452 n.8, quoting Fed. R. Evid. 804 (b) (3); *State* v. *Gold,* supra, 637. Federal and state courts have recognized that the requisite of rule 804 (b) (3) that "corroborating circumstances clearly indicate . . . trustworthiness . . . ." was so promulgated because " 'statements of this type tending to exculpate the accused are more suspect and so should have their admissibility conditioned upon some further provisions insuring trustworthiness.' House Committee on the Judiciary, Proposed Federal Rules of Procedure, H.R. Doc. 650, 93d Cong., 1st Sess. 15–16 (1973)." *State* v. *Smith,* 415 A.2d 553, 560 (Me. 1980); see *United States* v. *Zirpolo,* 704 F.2d 23, 26 (1st Cir.), cert. denied, 464 U.S. 822, 104 S. Ct. 87, 78 L. Ed. 2d 96 (1983); *United States* v. *Barrett,* supra, 253. This " 'requirement of corroboration [in rule 804 (b) (3)] should be construed in such a manner [so] as to effectuate its purpose of circumventing fabrication.' " *United States* v. *MacDonald,* 688 F.2d 224, 233 (4th Cir. 1982), cert. denied, 459 U.S. 1103, 103 S. Ct. 726, 74 L. Ed. 2d 951 (1983); *State* v. *Smith,* supra; see generally 4 J. Weinstein, Evidence (1985) pp. 804-123 through 804-157. Courts have therefore construed the corroboration requirement as "significant" and one that "goes beyond minimal corroboration." *United States* v. *Barrett,* supra; *United States* v. *Zirpolo,* supra, 25; *United States* v. *Hoyos,* 573 F.2d 1111, 1115 (9th Cir. 1978); *Laumer* v. *United States,* 409 A.2d 190, 200 (D.C. 1979); *State* v. *Barden,* 432 A.2d 404, 409 (Me.), cert. denied, 454 U.S. 1088, 102 S. Ct. 648, 70 L. Ed. 2d 624 (1981).

It is evident that there was significant evidence of the corroborative quality required. Shortly after the crime, at the time of Eugene's declaration to the defendant and Guess, each of those witnesses saw the victim's stolen pocketbook. The victim's driver's license, which she reported was in her stolen pocketbook, was also observed at that time. That license was later found in a garage on the premises where the Bryants resided. Eugene, who met the general description of the assailant, admittedly knew where her apartment was located. Testimony from witnesses not only put the defendant in his home at about the reported time of the crimes but also indicated that Eugene was not there at this time. Significantly, the latter's declaration to his mother included the actual means of entry into the victim's apartment by way of the window. His statement to Brown, directly admitting the break-in, furnished additional corroboration. In addition, his statements to his mother during the trial, contrary to his earlier admissions to her, that he would lie in court if called to testify strengthened the quality of the corroborative evidence adduced. This latter posture tends to confirm the defendant's claim that if Eugene would say this, then logically, he had something relevant to lie about. Moreover, the number of independent declarations provides additional corroboration for each.[19] *Chambers* v. *Mississippi,* supra, 300.

In sum, the excluded evidence was clearly trustworthy under the relevant criteria. It has been said that "the ultimate question [under rule 804 (b) (3) is] whether 'a reasonable man in [the declarant's] position would not have made the statement[s] unless he believed [them] to be true.' " *United States* v. *Goins,* supra; see *United States* v. *Brainard,* 690 F.2d 1117, 1124 (4th Cir. 1982); *United States* v. *MacDonald,* supra, 232–33; *State* v.

[19] This includes Eugene's earlier importuning of Perry to join with him in a break-in of the victim's apartment on Dell Avenue.

*Gold,* supra, 642, 643. Rule 804 (b) (3) "reflects [an] attempt to strike a fair balance between the exclusion of trustworthy evidence . . . and indiscriminate admission of less trustworthy evidence which, because of lack of opportunity for cross-examination and the [unavailability] of the declarant, is open to easy fabrication." *United States* v. *Barrett,* supra; *State* v. *Gold,* supra, 631; *State* v. *DeFreitas,* supra, 440. The trial court erred in excluding the proffered evidence. *State* v. *Gold,* supra, 640; see *State* v. *Sorbo,* 174 Conn. 253, 257, 386 A.2d 221 (1978).

### III

With reference to other matters that may recur at the new trial, we will address the defendant's claim that he was deprived of his constitutional rights to due process, a fair trial and to present a defense by the state's "repeated attempts" to impeach his alibi witnesses by "multiple references" to the claimed pretrial silence of those witnesses. We address this claim for the purpose of laying down certain guidelines for trial courts and counsel to be applied in future criminal trials, including the new trial we have ordered in this case. See *People* v. *Dawson,* 50 N.Y.2d 311, 406 N.E.2d 771, 428 N.Y.S.2d 914 (1980). A criminal defendant can adduce evidence at his trial in support of an alibi. "Although an alibi is sometimes spoken of as a defense, it operates, in this state, to entitle an accused to an acquittal when he has so far proved the alibi that a reasonable doubt of his guilt is raised upon all the evidence." *State* v. *White,* 155 Conn. 122, 123, 230 A.2d 18 (1967); see *State* v. *McKnight,* 191 Conn. 564, 584, 469 A.2d 397 (1983); *State* v. *Rosado,* 178 Conn. 704, 708 n.2, 425 A.2d 108 (1979).

For his claim of alibi, the defendant presented five witnesses: the defendant,[20] his mother, Joanne Mounts,

---

[20] The state's cross-examination of the defendant disclosed that, at the time of his arrest, he told Gavitt that he could not recall where he was on

her husband Donald, and Shawn Guess. None of these witnesses approached the police to inform them, as the state's cross-examination of four of them repeatedly suggested each should have, that the defendant was at home at the approximate time of the charged crimes.

Initially, it would seem that our recent decision in *State* v. *Ghere,* 201 Conn. 289, 513 A.2d 1226 (1986), would summarily dispose of this claim in favor of the state. The issue in *Ghere,* however, was "relatively narrow: whether the failure of the witnesses to approach the police with their alibi story was relevant on the issue of credibility or, more specifically, the issue of fabrication." Id., 303–304. In that case, we pointed out that "[a]lthough we do not believe that an alibi witness has a duty to report an alibi story to the police or, for that matter, to any other person, a witness in many instances naturally may be expected to convey such information, especially when the witness is friendly with the accused. Failure of the witness to do so would, under these circumstances, constitute grounds for impeachment." Id., 304; see *People* v. *Dawson,* supra, 322. We went on to say that the alibi witnesses there "were shown to be friends or acquaintances of the defendant and it would only have been natural for them to exculpate the defendant of any wrongdoing by approaching the police" and, therefore, the trial court correctly allowed the state to impeach them by questioning their failure to relate their stories to the police. *State* v. *Ghere,* supra, 305.

The defendant does not attack our holding in *Ghere.* Recognizing that it is permissible to cross-examine family members and friends for impeachment purposes, he argues before us that his claim was left open in a

the date of the crimes charged. When he testified on his own behalf, he said that he had later recalled that he had been at his home as he remembered that it was his mother's birthday. The state then cross-examined him at length as to why he had not later informed the police of that circumstance.

footnote in *Ghere*.[21] The defendant's claim, which was not decided in *Ghere,* is whether the impeachment of his alibi witnesses, because of their "silence" up to trial, violated his sixth amendment right to present a defense. Id., 301 n.9. Referring to *People* v. *Maschi,* 76 App. Div. 2d 808, 429 N.Y.S.2d 662 (1980), he argues that the manner in which the state was permitted to impeach his alibi witnesses violated his constitutional right to due process. His claim includes the assertion that no proper foundation was laid for the impeachment. He argues that the state should have had to establish such facts as whether the alibi witnesses knew that they had information that was exculpatory to the defendant. In this case, he also contends that the state insisted on yes or no answers to questions that merited elaboration. He also points out that although he had filed his notice of alibi witnesses in court nearly eight weeks prior to the trial, the state never approached any of the alibi witnesses before trial.

The defendant's "right to present his own witnesses to establish a defense . . . is a fundamental element of due process of law." *Washington* v. *Texas,* 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State* v. *Corchado,* 188 Conn. 653, 660, 453 A.2d 427 (1982); *State* v. *Bethea,* 167 Conn. 80, 83, 355 A.2d 6 (1974). This includes the right to present alibi witnesses, but there are few, if any, per se prohibitions on questioning such a witness. It can fairly be said that an alibi witness, like any other witness, may be cross-examined with a view to demonstrating the improbability or even fabrication of his testimony. Where, however, such a witness is cast in the posture of having been silent as to claimed exculpatory testimony and is not given a real opportunity to explain that silence, some courts have

[21] All the briefs in this case, those of the defendant and the state, were filed in September, 1986, only weeks after our decision in *State* v. *Ghere,* 201 Conn. 289, 513 A.2d 1226, which was published on August 26, 1986.

suggested salutary responses in an effort to insure basic fairness. See, e.g., *Commonwealth* v. *Brown,* 11 Mass. App. 288, 416 N.E.2d 218 (1981); *People* v. *Dawson,* supra.

Some courts have, therefore, required that the state lay a "proper foundation" for this type of cross-examination. In *Dawson,* the court said: "In most cases, the District Attorney may lay a 'proper foundation' for this type of cross-examination by first demonstrating that the witness was aware of the nature of the charges pending against the defendant, had reason to recognize that he possessed exculpatory information, had a reasonable motive for acting to exonerate the defendant and, finally, was familiar with the means to make such information available to law enforcement authorities." *People* v. *Dawson,* supra, 321 n.4; see *Commonwealth* v. *Brown,* supra. A "proper foundation" may better aid the trier of fact in determining whether the testimony of such a defense witness "is an accurate reflection of the truth or is, instead, a 'recent fabrication.' " *People* v. *Dawson,* supra, 321. Common sense and human experience may indicate, in a given case, that there may be explanations for a witness' pretrial silence that are entirely consistent with that witness' posture at trial. As *Dawson* points out, some persons "may routinely avoid contact with law enforcement authorities out of an ingrained sense of fear or mistrust of officialdom. . . . Others may refrain from volunteering information to the police or [prosecuting attorney] because they believe that their efforts to exonerate the suspect would be futile . . . [and] some may remain silent because they were explicitly instructed to do so by the defendant's attorney." Id., 321–22. These examples are, however, hardly exhaustive.

It may be prudential for the trial court to have a bench conference to ascertain "whether [a] witness refrained from speaking under the advice of defense

counsel, for in such a case examination on the issue of the witness' postconsultation silence would be improper and could well result in a mistrial." Id., 323. In a given case, other circumstances might properly suggest a bench conference, initiated by either counsel or the trial court. Consistent with a defendant's constitutional rights, the prosecution, in accord with the high standards of that office, must act in good faith in cross-examining such a defense witness about his prior failure to have come forward. Whether the interests of justice reasonably suggest a curative instruction or an instruction at the end of all the evidence must await each particular case. See *People* v. *Dawson,* supra, 322-23; *People* v. *Brown,* 104 App. Div. 2d 383, 384, 478 N.Y.S.2d 711 (1984).

We have discussed this issue with the view toward anticipating a smoother presentation of this issue at the new trial. In the context of this case, had the trial court and the state been alerted more distinctly, specifically by an exception or exceptions, to matters now urged upon us on this issue, the state's presentation might well have taken a somewhat different course.

The remaining claims of error need not be discussed as they should not recur.

There is error, the judgment is set aside and the case is remanded for a new trial.

In this opinion the other justices concurred.